# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ADVANTOR SYSTEMS CORPORATION,**

   **Plaintiff,**

**v.**              Case No: **6:14-cv-533-Orl-31DAB**

**DRS TECHNICAL SERVICES, INC.,**

   **Defendant.**

## ORDER

This cause came on for consideration with oral argument on the following motions filed herein:

> **MOTION:** **MOTION FOR SANCTIONS AGAINST DEFENDANT FOR SPOLIATION OF EVIDENCE (Doc. No. 40)**
>
> **FILED:**  **October 7, 2014**
>
> ---
>
> **THEREON** it is **ORDERED** that the motion is **DENIED** for the reasons set forth below.

> **MOTION:** **MOTION TO COMPEL ANSWER TO INTERROGATORY 12 AND TO PRODUCE CERTAIN DOCUMENTS (Doc. No. 47)**
>
> **FILED:**  **November 5, 2014**
>
> ---
>
> **THEREON** it is **ORDERED** that the motion is **GRANTED in part and DENIED in part** as set forth below.   DRS is **ORDERED** to produce the billing information for, compensation paid to, and time spent on projects by Larson, Ellfeldt, and Alvarez; the Motion is **DENIED** in all other respects.

Plaintiff Advantor Systems Corporation filed suit against Defendant DRS Technical Services, Inc. asserting a breach of contract claim for the alleged "poaching" by DRS of Advantor's

employees and the receipt and potential use of Advantor's proprietary information in violation of the parties' Nondisclosure Agreement. Doc. 1. Advantor has since filed an Amended Complaint asserting additional claims against DRS for tortious interference with the contracts of three former Advantor employees – Greg Larson, John Ellfeldt, and Axel Alavarez. Doc. 32.  Advantor now moves for sanctions against Defendant DRS Technical Services, Inc., for its intentional bad faith spoliation of evidence.   Based on the materials submitted and the arguments made at the hearing[1], the Court finds that sanctions are not warranted.

**Factual Background**

Advantor is a security technology company that provides computer-based security services[2] that meet the specifications and requirements of its customers, including the United States Air Force Major Commands and Reserve Components, which represents the largest single customer group for Advantor. Doc. 32 ¶ 7. Advantor is one of only three security systems manufacturers certified by the United States Air Force to produce the equipment and software to protect priority level resources; Advantor additionally provides the installation, training and ongoing logistics support for the maintenance and testing of the systems. Doc. 32 ¶ 7. Defendant DRS also provides security system services, including maintenance of security equipment to defense organizations such as the United States Air Force, as one of many companies[3] that provide security equipment located at certain Air Force bases. Doc. 34 at 1; Doc. 34 at 17, Coen Aff. ¶ 6.

---

[1] Oral argument was held on January 6, 2015.

[2] These services include: hardware design, software development, system manufacturing, pre-deployment integration and assembly, turnkey systems installation, and ongoing logistical support. Doc. 32 ¶ 7.

[3] Advantor alleges that DRS is a direct competitor or "attempting to gain entry into the business" of designing, installing, supporting, and/or servicing electronic access control and intrusion detection systems ("IDS") and electronic security systems ("ESS") work for United States Government customers. Doc. 32 ¶ 3. DRS contends that it is not a direct competitor of Advantor because DRS was eligible to bid on the maintenance project at issue in this case, and Advantor was not. Doc. 34 at 17, Coen Aff. ¶ 5, 8-9. Whether DRS is a "direct competitor" is not important for purposes of this Spoliation motion.

In July 2013, DRS received notice that the Space and Naval Warfare Systems Command ("SPAWAR") might be issuing a request for proposals ("RFP") for the maintenance of intrusion detection systems at various Air Force bases. Coen Aff. ¶ 6. On July 17, 2013, DRS and Advantor entered into a written Mutual Nondisclosure Agreement (the "NDA" or the "Agreement"), based on DRS's form document, since the parties contemplated working together on the SPAWAR Project, with DRS as the prime contractor and Advantor as the subcontractor. See Doc. 32-1; Doc. 32 ¶ 8; Coen Aff. ¶ 12.

Among other things, the NDA between DRS and Advantor contained several relevant clauses which provided as follows:

> 9. This Agreement should not be construed as a sales agreement, teaming agreement, joint venture or similar arrangement.
> 10. Neither Party has an obligation to supply Proprietary Information to the other Party; furthermore, neither Party has an obligation under this Agreement to purchase any item or service from the other Party.
> * * *
> 14. Upon written request of the disclosing Party, the receiving Party shall return all originals, copies, reproductions and summaries of Proprietary Information in the receiving Party's possession or control or, at the disclosing Party's option, destroy and certify to such destruction.
> 15. The Parties agree that, during the term of this Agreement and for a one (1) year period thereafter, neither Party shall knowingly or actively seek to hire any employee of the other Party. This restriction shall not prohibit either Party from hiring any person as a result of the use of an independent employment agency (so long as the agency was not directed by such party to solicit such person) or as the result of the use of a general solicitation (such as an advertisement) not specifically directed to employees of the other Party.

Doc. 32, Am. Comp., Exhibit A at ¶¶ 9, 10, 14, 15. Doc. 32 ¶ 10.

On August 20, 2013, SPAWAR officially issued the RFP. Coen Aff. ¶ 12. The RFP permitted awardees to include subcontractors as part of their bid. Coen Aff. ¶ 13. DRS contacted Advantor and other manufacturers, including Open Roads Consulting, Inc., Diebold, and Honeywell. The responses to the RFP were due no later than September 12, 2013. Coen Aff. ¶ 13. DRS's position is that, despite its many requests, Advantor never provided DRS with all of the

information necessary to include Advantor as a subcontractor in the bid and DRS was forced to submit its bid on September 12, 2013, without Advantor as a subcontractor; for subcontractors to be approved, SPAWAR required very specific information to be submitted, including pricing data in a particular format. Coen Aff. ¶ 16-18.

On September 30, 2013, DRS was awarded the SPAWAR Project. Doc. 32 ¶ 11; Doc. 34 at Coen Aff. ¶ 20. DRS contends that, since Advantor was not approved by SPAWAR, it could not work on the IBDSS contract as a subcontractor. Coen Aff. ¶ 23-27. Advantor's theory of the case is that DRS planned to "self-perform" on the SPAWAR Project by recruiting Advantor's certified personnel after excluding Advantor from the Project. Doc. 28. The parties dispute the efforts made to work together after the SPAWAR Project was awarded.

DRS subsequently informed Advantor in October 2013 that DRS had employed or offered employment to three recent Advantor employees. Doc. 32 ¶ 15. Advantor learned that DRS had hired Axel Alvarez (an ESS Administrator), Greg Larson (a Senior Field Trainer), and John Ellfeldt (a Lead Installer), allegedly in violation of the Non-Disclosure Agreement. Doc. 32 ¶¶ 16, 28.

All three former Advantor employees resigned in November 2013. Doc. 32 ¶¶ 25-27. Advantor alleges that Mr. Larson had access to Advantor's proprietary information and, once he was hired by DRS, provided certain files to DRS[4]. Doc. 32 ¶¶ 26, 33-41; Doc. 28-4 at 18-24. Advantor also alleges that DRS in fall of 2013 posted a job description on Monster.com specifically targeting Advantor employees by mentioning ESS programs and requiring experience with Advantor's IDS equipment. Doc. 32 ¶ 30. On March 18, 2014, DRS issued its notice of termination of the NDA. Doc. 32 ¶ 48.

---

[4] Advantor's allegations concerning Mr. Ellfeldt and Mr. Alvarez are not at issue in this spoliation motion.

Advantor filed suit on April 3, 2014, and discovery in the lawsuit subsequently began. After conducting some discovery, on October 7, 2014, Advantor filed its Motion for Sanctions against Defendant for Spoliation of Evidence, *i.e.*, the reformatting of the laptop used by Greg Larson during the brief time he was employed by DRS[5]. Doc. 40. Most of the background facts and the dates surrounding Larson's hiring and possession of the DRS laptop are not disputed. Larson was a Senior Field Trainer for Advantor's certified IDS systems, with access to Advantor's proprietary information. Doc. 32 at ¶ 20.

Larson had a confidentiality agreement with Advantor which prohibited him from using, appropriating, or disclosing Advantor's confidential information to any person or entity other than in connection with his position and for the benefit of Advantor; it also prohibited him from removing such information unless in connection with his employment with and for the benefit of Advantor and required him, upon termination or resignation, to immediately return all confidential information in his possession, whether on his person or at any other location[6]. Doc. No. 32-2.

Putting aside for the moment the dispute over how DRS recruited and hired the former Advantor employees, it is undisputed that Larson resigned from Advantor on November 10, 2013 and was hired by DRS on November 18, 2013. Doc. 40-2 (McNeill Decl.) ¶ 3; Doc. 57-22, Larson Ex. 91 ¶7. Larson received the laptop from DRS on November 21, 2013. Doc. 57-25, Larson Dep. (p. 199). Advantor learned of Larson's hiring and sent a letter on November 22, 2013 to DRS stating:

---

[5] DRS argues Larson, based on his testimony, used the laptop for three to five days – during the time he was hired but not relocating across country to his position in Oklahoma. Larson at 236-37. Advantor argues Larson used the laptop for two weeks, which would include the time between when he was hired (November 18) to when he was relocating from Florida to Oklahoma (December 2, 2013). Doc. 57-22, Larson Dep. (pp. 201, 237-38).

[6] Advantor also alleges that Larson sent Advantor's proprietary information to at least two DRS employees without authorization, and DRS refused to return or certify the destruction of Advantor's proprietary data in violation of the NDA and the confidentiality obligations of his non-compete agreement. Doc. No. 32 ¶¶ 39, 53.

- 5 -

> Demand is hereby made that DRS immediately terminate its relationship with Mr. Larson, provide Advantor with written notice of such termination, and take all steps necessary to identify, preserve (without alteration), and return to Advantor all confidential and/or proprietary information of Advantor including without limitation, all documents (including any electronically stored information or other data generated by and/or stored on DRS' computers and other storage media), in DRS' possession, custody, or control.

Doc. 40, Ex. B-1. On December 3, 2013, DRS conducted an investigation and on December 10, DRS terminated Larson's employment. Doc. 56-1, Coen Aff. ¶¶ 60-63. On December 12, 2013, Larson's DRS laptop was reformatted, and, on January 6, 2014, it was issued to a new employee, as part of the company's normal, established routine. Doc. 56-2, Torrico Aff. ¶¶ 6-7. The parties engaged in discussions in January 2014 about the return of eight files[7] that Larson had sent to DRS employees in October 2013. Doc. 40, Ex. B; Doc. 32 ¶ 33-39.

Discussions between the parties broke down, and Advantor subsequently filed suit against DRS in April 2014, having sent a second preservation notice in March 2014. Doc. 40-11 (Letter from B. Elledge). Following a discussion between the parties in June 2014, when DRS confirmed that Larson's laptop hard drive had been reformatted and a new operating system installed by DRS (Doc. 40, Ex. E, F), an extensive investigation of Larson's DRS computer hard drive followed, with the assistance of the parties' respective computer forensic experts. DRS, through its computer expert and beginning in July 2014, produced listings of file and folder names that had been on Larson's DRS computer. Doc. 40. However, as noted by DRS in the parties' later filed Joint 502(d) Order Motion, much of Larson's reformatted computer was determined to be "nearly unreadable" and "[t]he detection of protected information under these circumstances with ESI in this condition is extremely difficult." Doc. 36 at ¶ 5. In late July 2014, DRS made a production

---

[7] The eight documents allegedly consist of: SW Microwave Sensors.ppt; OmnitTrax Service and Repair.ppt; Intro to Thermal Imagining Systems Presentation.pptx; 3004 Cabinet internal view 01.jpg; 3007 Cabinet external view.jpg; C3602_2011-10-2016-09.jpg; Case 31266~salesforce. Pdf; and Old Weekly Inventory 10123.xlsx. Doc. 40 at 10.

of "files" from the Larson computer, but the files were overwhelmingly, if not totally, corrupted or otherwise not able to be processed or opened due to the reformatting.  Doc. 40-7.

Advantor's computer forensic expert independently found, in September 2013, an even longer list of files that had once existed on Larson's DRS computer during his late 2013 employment period.  See Doc. 40-8 (file list).  The parties do not dispute that the contents of the files on these lists (from DRS and Advantor experts) were not recoverable due to the reformatting and installation of a new operating system that occurred on the machine. Doc. 40-9 Supp. Sun Decl. ¶¶ 6-7, 9-10. Advantor believed, based on its review of the file names that these files appeared to be proprietary to Advantor or to have come from Advantor's computer systems. Doc. 40-10 (Whirley Decl.) ¶¶ 3-8.

Advantor filed its Motion for Sanctions on October 7, 2014, alleging that spoliation of Larson's DRS computer had occurred and submitted the March 28, 2014 Declaration of Gregory A. Larson in support of Advantor's Motion.  Docs. 40, 40-3.  Larson stated that he had sent Advantor information to a DRS recruiter (Ms. Morrison), including training manuals on October 5-6, 2013 (before he was hired).  Doc. 40-3 (Larson Decl.) ¶ 5.  Larson also stated that "DRS, through Coen, further advised me how to terminate my employment with Advantor, specifically telling me to give no advance notice of my resignation with Advantor.  Coen advised me to exit my employment this way because of my access to Advantor documentation and with the intent and understanding that such information would be shared with DRS."  Doc. 40-3 ¶ 10.  "Coen specifically told me to not dispose of Advantor information, that it was fine to have Advantor information at my house, and to be careful not to bring it on the Air Force base."  *Id*.  According to Larson, DRS wanted him to come to Vance Air Force Base as soon as possible to begin work on the SPAWAR project for DRS, which he did beginning December 2, 2013, although DRS began paying him before that, as of

November 18, 2013, when he was in the process of moving to Vance Air Force Base in Oklahoma; the first day he could be on site at Vance AFB for DRS was December 2, 2013. *Id.* ¶ 12.

Though the precise nature of a resolution of the dispute between Advantor and Mr. Larson is not crystal clear[8], they appear to have reached some sort of agreement which led Advantor to provide (among other things) a proposed affidavit for him to sign. Doc. 57-1 (Larson Dep. Ex. 8). In Mr. Larson's January 27, 2014 Affidavit he states that he only sent, via e-mail, the eight allegedly-proprietary Advantor documents, (which DRS returned) and he did not distribute any information or documents to any other person. Doc. 57-2. He also noted through interlineation his opinion that he did not consider the documents to be confidential as they were publically accessible or taken word for word from manufacturer's manuals, and he signed "documents [with] additions to prevent self-incrimination (5th amendment right) and he had returned Advantor documents and CD/DVD's in his custody. Doc. 57-2. Advantor did not produce Larson's January 27, 2014 Affidavit until approximately ten months later when Larson was initially scheduled to be deposed in October 2104. Doc. 56 at 7.

When Larson was deposed, on November 18 to 19, 2014, he testified that he had only used his DRS-issued laptop for 3 days (Doc. 57-25 at 237) and he did not remember loading anything from his Advantor employment on his DRS-issued laptop. Doc. 57-26 at 312. He testified that he did not recall anyone taking any documents from the computer with a thumb drive or other device and no one other than him had accessed his DRS-issued laptop (*Id.* at 313); Larson had some discs and manuals when he left Advantor but they were in a box while he was moving from Florida to Oklahoma, and he testified that he returned them to Advantor. *Id.* at 71, 76-81, 294-95. Larson

---

[8] Mr. Larson testified to communications with Advantor about dropping the suit against him filed in state court. *See, e.g.*, Doc. 57-26 at 442.

stated in an e-mail to Advantor: "So if you read this correctly, I only worked for [DRS] for two weeks before being terminated and I sent them nothing because they flat out ignored me up until firing me. Advantor can rest assured that DRS does not have their manuals or documents, at least not from me." Doc. 57-26 at 441; Doc. 57-24.

Larson testified, between November 20, 2013 and December 10, 2013 – for the three days he was not traveling and he used the computer -- he had saved documents on his DRS-issued laptop that he needed for his job. Doc. 57-25 at 237. Larson also testified that the file names from Advantor's list (created by its expert) found in Larson's DRS-issued laptop were names of documents, obtained by Larson from the internet, given to him by someone on the Air Force base, were authored or created by a non-Advantor entity such as the government, or related to Advantor's legal case against him. Doc. 57-25 at 220-226, 228-232, 251-271, Exs. 77-89. Other than the list of documents identified by Advantor and DRS's forensic experts, which were shown to him during his deposition, Larson does not recall saving any other documents to his DRS-issued laptop in the days he used it; his belief was that none of the documents were confidential, proprietary or constituted trade secrets of Advantor.  Doc. 57-26 at 246.  Larson spoke to Advantor's attorneys three or four times and they did not ask him what he had on his laptop. Doc. 57-25, Larson Dep. (pp. 247, 249). Larson's DRS-issued laptop was retrieved on December 10, 2013 by DRS.  Doc. 57-25, Larson Dep. (p. 236).  According to DRS, all email and attachments are stored on DRS' central email servers, not individual computers, and the email that may have been located on the local hard drive would be duplicative of email stored and preserved on the server.  Doc. 40-6 at 3.

## Analysis

**Standards**

"Spoliation" is the "intentional destruction, mutilation, alteration, or concealment of evidence." *Blacks Law Dictionary* 1437 (8th Ed. 2004). Federal law, not state law, controls the

- 9 -

imposition of sanctions for failure to preserve evidence in a diversity case. *See Flury v. Daimler Chrysler Corp.,* 427 F.3d 939 (11th Cir. 2005) (federal law governs the imposition of spoliation sanctions), *cert. denied*, 126 S. Ct. 2967 (2006); *see also King v. Illinois Central R.R. Co.* 337 F.3d 550, 556 (5th Cir. 2003) (same); *Assimack v. J.C. Penney Corp.*, 2005 WL 2219422, *2 (M.D. Fla.. 2005) (same). The Court has broad discretion to impose sanctions derived from its inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases. *Id.* at 944 (citing *Chambers*, 501 U.S. at 43). Sanctions for discovery abuses are intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process. *Id*. The courts have the inherent power to enter sanctions as punishment for a defendant's destruction of documents:

> Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information. While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.

*Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 126 (S.D. Fla. 1987) (quoting *Wm. T. Thompson v. General Nutrition*, 593 F.Supp. 1443, 1455 (C.D. Cal. 1984)).

Federal Rule of Civil Procedure 37 also authorizes a panoply of sanctions for a party's failure to comply with the rules of discovery. Subsection (d) provides that where a party fails to serve a written response to a request for inspection submitted under Rule 34, after proper service of the request, the court may order sanctions, including those actions authorized by Rule 37(b)(2)(A)(i)-(vi), which provide the following remedies: (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or

defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; or (vi) rendering a default judgment against the disobedient party; Fed. R. Civ. P. 37(b). Although Rule 37(b) applies when a party fails to comply with a court order, Rule 37(d)'s requirement that a party participate in discovery that is not regulated by the court expressly adopts most of the sanctions in Rule 37(b)(2), including the power to grant a default judgment. *See Telectron,* 116 F.R.D. at 128-29 n. 8.

Although federal law controls spoliation sanctions, the Court's opinion may be "informed" by state law, as long as it is consistent with federal law, because federal law in the Eleventh Circuit does not set forth specific guidelines on spoliation. *Flury*, 427 F.3d at 944. Under Florida law, the remedy for a party failing to produce crucial but unfavorable evidence that is destroyed or inexplicably disappears is an adverse inference or discovery sanctions. *Martino v. Wal-Mart Stores, Inc*., 908 So.2d 342 (Fla. 2005). Prior to the court exercising any leveling mechanism due to spoliation of evidence, the court must decide: 1) whether the evidence existed at one time, 2) whether the spoliator had a duty to preserve the evidence, and 3) whether the evidence was critical to an opposing party being able to prove its prima facie case or a defense. *Smith v. Sohaan Dev*., Inc. No. 6:12-cv-1369-Orl-18DAB, 2013 WL 5720163 at *2 (M.D.Fa. Oct. 1, 2013) (citing *Golden Yachts, Inc. v. Hall*, 920 So.2d 777, 781 (Fla. 4th DCA 2006)); *see Flury*, 427 F.3d at 944 (applying Georgia spoliation and sanctions law).

In addition to the factors applied by Florida courts, under federal law in the Eleventh Circuit, the most severe sanction of default, for instance, should be exercised only when there is a showing of bad faith and lesser sanctions will not suffice. *See Flury*, 427 F.3d at 944-45; *see also Aldrich v. Roche Biomedical Laboratories*, 737 So.2d 1124, 1125 (Fla. 5th DCA 1999) (the appropriate sanction when a party fails to preserve evidence in its custody depends on the willfulness or bad

faith of the party responsible), rev. denied, 751 So.2d 1250 (Fla. 2000). An adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith; thus, negligence in losing or destroying records is not enough for an adverse inference, as "'it does not sustain an inference of consciousness of a weak case.'" *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (quoting *Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)).  The Court should not infer that the missing evidence was unfavorable unless the circumstances surrounding the evidence's absence indicate bad faith.  *Id.*

**Application**

*Duty to Preserve*

Based on the facts as presented in the moving papers and the Response, and as the Court stated at the hearing, under the facts of this case, DRS had a duty to preserve the contents of the Larson laptop as of November 22, 2013, once DRS received notice from Advantor that it was contesting the hiring of Larson.  "[O]nce a party reasonably anticipates litigation, it has an obligation to make a conscientious effort to preserve electronically stored information that would be relevant to the dispute."  *United States v. DSE, Inc.*, No. 8:08-cv-2416-T-23EAJ, 2013 WL 610531, at *7 (M.D. Fla. Jan. 17, 2013); *Simon Prop. Group, Inc. v. Lauria*, No. 6:11-cv-01598-0rl-31KRS, 2012 WL 6859404, at *6 (M.D. Fla. Dec. 13, 2012), *adopting Report and Recommendation*, 2013 WL 152525 (M.D. Fla. Jan. 15, 2013) (Presnell, J.).  The preservation notice Advantor sent on November 22, 2013 was clear, litigation should have been reasonably anticipated, and DRS had an obligation to preserve Larson's DRS laptop.  At the hearing, when the Court questioned why DRS had chosen not to preserve the laptop, counsel for DRS explained the failure to preserve was simply a "mistake" by in-house counsel.

Unlike some cases, the identification of ESI and its preservation here would have been easy and straight-forward. No designation of likely custodians or deep search of servers and archives was

necessary. Larson's laptop was already in hand and could, without meaningful effort, have been preserved or forensically copied. The failure to take the obvious steps to preserve the evidence while taking serious action to terminate an employee is mystifying. Nonetheless, that decision does not appear to be the product of any actual intent to destroy specific evidence inasmuch as there is no indication that anyone from DRS ever even knew what was on the laptop.

Advantor does argue that many of the file names found on the listing of file names that its computer forensic expert (Mr. Sun) had independently found as once existing on Larson's DRS computer during his November-December 2013 employment period were suspiciously not found by DRS's computer forensic expert as having been on Larson's DRS laptop. Doc. 40-9 ¶¶ 8-9. Advantor also argues that many of these files *appear* to be proprietary to Advantor or to have come from Advantor's computer systems. Nonetheless, from Larson's testimony and the circumstances of his brief employment, these suspicions do *not* rise to the level of inference that anything of significance was compromised.

DRS argues that, without a showing that Larson's DRS laptop contained relevant and crucial information, Advantor's Motion fails. DRS argues that, despite having access to Larson and obtaining his March 2014 Affidavit, Advantor's argument is based upon pure speculation, and that Advantor has failed to provide evidence that Larson provided Advantor's confidential documents to DRS once saved or from his DRS-issued laptop. DRS also points out Mr. Larson's revisions to the proposed January 27, 2014 affidavit prepared by Advantor's lawyers contradicts Larson's later March Affidavit and does not support Advantor's Motion.

Based on the record as a whole, there is no real likelihood that important or protected files were ever on Larson's DRS computer. Further, even if there were some files copied onto the laptop that should not have been, there is no showing that they ever went anywhere that could harm Advantor's legally protected interests. Advantor has failed to show that there was any evidence on

Larson's DRS laptop or that the evidence (if any) was critical to being able to litigate the issues in this case.   Under these circumstances, despite the essentially unexplained reformatting of Larson's laptop, no sanctions are warranted.

Each party shall bear its own motion costs.

**DONE** and **ORDERED** in Orlando, Florida on January 28, 2015.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record