# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ADVANTOR SYSTEMS
CORPORATION,**

        **Plaintiff,**

**v.**                                                                 **Case No:   6:14-cv-533-Orl-31DAB**

**DRS TECHNICAL SERVICES, INC.,**

        **Defendant.**

_____

## ORDER

This matter comes before the Court on the Motion for Summary Judgment (Doc. 112) filed by the Defendant, DRS Technical Services, Inc. ("DRS"), the response in opposition (Doc. 125) filed by the Plaintiff, Advantor Systems Corporation ("Advantor"), and the reply (Doc. 136) filed by DRS.   The Court held a hearing on the matter on September 29, 2015.

## I.      Background

For a number of years, Advantor – a manufacturer of electronic security systems – provided and maintained such systems on numerous Air Force bases through individual maintenance contracts.   (Pretrial Statement, Doc. 158 at 2).   In 2013, the Air Force opted to consolidate those individual contracts into a single, large-scale contract.   *Id*.   The Air Force engaged the Space and Naval Warfare Systems Command ("SPAWAR"), an agency of the United States Navy, to oversee the consolidation process and manage the maintenance of the Air Force's security system equipment.   *Id*.   SPAWAR limited bidding on the consolidated contract (henceforth, the "SPAWAR Contract") to eight companies that already been awarded a certain

type of contract by the agency. *Id.* DRS was one of those eight companies; Advantor was not, and therefore was not eligible to bid on the SPAWAR Contract. *Id.*

In July 2013, DRS learned that SPAWAR would be accepting bids on this new contract. DRS began negotiations and entered into nondisclosure agreements ("NDAs") with potential subcontractors, including Advantor. *Id.* at 3. Advantor entered into the NDA with DRS on July 17, 2013. *Id.* at 4. The NDA restricted DRS from targeting Advantor employees for hire and also defined how proprietary information that the two companies wanted to share would be identified and protected. (Nondisclosure Agreement, Doc. 32-1). During negotiations with DRS, Advantor provided, *inter alia*, information about its past performance and a lump sum price quote for its subcontracting services on the SPAWAR Contract **and a form identifying where Advantor equipment was located on the bases covered under the project.** (Pretrial Statement at 2).

On August 16, 2013, DRS posted a number of job advertisements in anticipation of being awarded the SPAWAR contract. *Id.* at 4. The ads sought security system technicians with experience working on systems produced by a variety of manufacturers, including Advantor. *Id.* at 3.

SPAWAR issued its Request for Quotation ("RFQ") on August 20, 2013. *Id*. at 4. DRS did not include Advantor as a subcontractor in its bid to SPAWAR. *Id*. at 3. On September 30, 2013, DRS was awarded the SPAWAR Contract. *Id*.

After being awarded the contract, DRS received Advantor manuals and drawings from Air Force personnel to use with the SPAWAR project equipment. *Id.*[1] DRS also hired

---

[1] Advantor provides manuals and drawings to the Air Force when the Air Force purchases its equipment.

approximately 50 individuals for the SPAWAR contract, 3 of whom – Greg Larson, John Ellfeldt, and Axel Alvarez – were working for Advantor employees when they were hired. *Id*.

While employed by Advantor, Larson, Ellfeldt, and Alvarez had each signed a "Confidentiality, Noncompetition and Nonsolicitation Agreement" (henceforth, the "Employment Agreement") (Doc. 82-2). Among other things, the Employment Agreement prohibited former Advantor employees from divulging confidential information and working for Advantor's competitors.

In the instant suit, Advantor asserts three claims, spread over five counts: first, that DRS breached the NDA by poaching Larson, Ellfeldt, and Alvarez and by misusing Advantor's proprietary information (Count I); second that DRS tortiously interfered with Advantor's Employment Agreements with the trio (Counts II-IV); and third, that it violated Florida's Uniform Trade Secrets Act, §§ 688.001 *et. seq.* ("FUTSA"), by receiving and using information from the three former Advantor employees, manuals from the Air Force, and the pricing and past performance information from Advantor (Count V). By way of the instant motion, DRS seeks summary judgment as to all five counts.

## II.    Legal Standards

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

## III.   Analysis

### A.   Breach of the NDA

The parties agree that Virginia law governs the breach of contract claim. Under Virginia law, the elements of a breach of contract action are: (1) a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of that obligation, and (3) injury or damage to the plaintiff caused by the breach of obligation. *Filak v. George,* 267 Va. 612, 619 (2004).

#### 1.   The "No Direct Hire" Clause

The NDA contained a non-hire/non-poaching clause (referred to as the "no direct hire clause") which provides, in full,

> The Parties agree that, during the term of this Agreement and for a one (1) year period thereafter, neither Party shall knowingly or actively seek to hire any employee of the other Party. **This restriction shall not prohibit either Party from hiring any person as a result of the use of an independent employment agency** (so long as the agency was not directed by such party to solicit such person) **or as the result of the use of a general**

> **solicitation (such as an advertisement) not specifically directed
> to employees of the other Party.**

(Doc. 82-1 at 5) (emphasis added).   DRS contends that the hiring of Larson, Ellfeldt, and Alvarez did not violate the no direct hire clause because the hires resulted from general, public ads for positions working on the SPAWAR Contract rather than ads that were directed to employees of Advantor.   (Doc. 112 at 22-23).   *Id.*   According to DRS, the ads resulted in more than 1300 applications from about 880 separate candidates, only 5 of whom were Advantor employees at that time.   (Doc. 112 at 24).   Ultimately, DRS hired about 50 individuals for the program, including three Advantor employees – *i.e.*, Larson, Ellfeldt, and Alvarez.

The ads at issue did mention Advantor in a section titled "Additional Desirable Skills and Knowledge."   (Doc. 112 at 23).   This section of the ad sought electronics technicians with 5 years of experience maintaining a variety of security systems; it listed 29 types of security systems, including one manufactured by Advantor.   However, Advantor admits that there are many individuals who have experience working on Advantor systems that are not Advantor employees, including former employees and people trained by Advantor.   In addition, DRS has provided evidence that Larson, Ellfeldt, and Alvarez contacted DRS before anyone at DRS contacted them, and there is no evidence to the contrary.

There is no evidence from which a reasonable factfinder could conclude that Larson, Ellfeldt, and Alvarez were hired as the result of anything other than a general solicitation not specifically directed to Advantor employees.   As this was permitted under the no direct hire clause, DRS is entitled to summary judgment as to on this issue.

## 2.   Proprietary Information

The NDA provided that for any disclosure to be considered "Proprietary Information" and therefore subject to protection from misuse, "it shall be identified in writing at the time of the

disclosure by an appropriate legend, marking, stamp or positive written identification on the face thereof to be Proprietary Information." (Doc. 82-1 at 2). Advantor identified two items that it disclosed to DRS pursuant to the NDA and which, it alleges, DRS misused: a lump sum price quote for its services as a subcontractor on the SPAWAR Contract and a description of Advantor's past performance. (Doc. 112 at 25).

However, only the price quote is even arguably proprietary, and – more importantly – neither item was identified or marked by Advantor as "Proprietary Information," as required by the NDA. Advantor attempts to rely on boilerplate confidentiality language appended to e-mails it sent to DRS, but this language is not enough to satisfy the identification/marking requirements of the NDA. Because the allegedly proprietary information was not properly marked or identified, it was not subject to the NDA, and its use cannot support a breach of contract claim. Further, even assuming *arguendo* that the lump-sum price quote was proprietary information, there is no evidence of its misuse. The only evidence is that DRS used it for the intended purpose of determining whether to work with Advantor as a subcontractor. On this issue as well, DRS is entitled to summary judgment.

### 3. Damages

Advantor seeks lost profit damages for its breach of contract claim.[2] "As a general rule, damages for breach of contract are limited to the pecuniary loss sustained." *Sunrise Continuing*

---

[2] Advantor lumps its various damages theories together in support of all its claims. One of these theories involves an equitable remedy: Advantor claims that, as a result of the alleged breach of the NDA, DRS should be made to disgorge all the profit it earned on the SPAWAR Contract. However, breach of contract is a legal claim for which contract damages apply, rather than the equitable remedy of unjust enrichment. *Webster v. Royal Caribbean Cruises, Ltd.,* 124 F. Supp. 2d 1317, 1326-27 (S.D. Fla. 2000) (citing *Corn v. Greco,* 694 So. 2d 833, 834 (Fla. 2d DCA 1997); *Cross v. Strader Constr. Corp.,* 768 So. 2d 465, 466 (Fla. 2d DCA 2000)). "[T]he theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy." *Id.* (quoting *Gary v. D. Agustini & Asociados, S.A.,* 865 F. Supp. 818,

*Care, LLC v. Wright*, 277 Va. 148, 156 (2009). Proof of damages is an essential element of a

breach of contract claim, and failure to prove that element warrants dismissal of the claim. *Filak v.*

*George,* 267 Va. 612, 619–20 (2004). The plaintiff also has the "burden of proving with

reasonable certainty the amount of damages and the cause from which they resulted; speculation

and conjecture cannot form the basis of the recovery." *Shepherd v. Davis,* 265 Va. 108, 125 (2003)

(citations omitted). Advantor claims that it is entitled to the profits it would have made if its then-

existing contracts with the Air Force had been renewed an additional three years. However, DRS's

alleged breach did not render Advantor ineligible to bid on the SPAWAR contract. Advantor did

not lose profits because of any wrong committed by DRS. Plaintiff has not met its burden of

proving that the lost profits were caused by DRS's breach. Disgorgement is also not an

appropriate measure of damages. Because a contract exists, the damages sought must flow from it.

DRS's profits simply do not flow from the NDA.

### B. Tortious Interference

In Counts II, III, and IV, Advantor contends that DRS tortiously interfered with the

Employment Agreements between itself and Larson, Ellfeldt, and Alvarez, respectively. In

pertinent part, those agreements provide as follows:

> 2. Confidential Information. Employee recognizes that she/he
> will learn, receive and/or have access to confidential and proprietary
> information relating to the business of Advantor, its successors,
> assigns, parent, subsidiaries, affiliates, or customers and that the
> restrictions concerning Advantor's confidential and proprietary
> information are reasonable in scope and necessary to protect
> Advantor's interests:
>
> a. Definition. "Confidential Information" shall mean
> information not available to the public relating to Advantor's

827 (S.D. Fla. 1994)). In addition, there is no basis for such an award here. Advantor has made
no showing that any of DRS's profit on the SPAWAR Contract was attributable to the hiring of
the three Advantor employees or the information Advantor disclosed to it.

business including, but not limited to, technical, marketing, sales programs or strategies, products, designs, plans, concepts, reports, proposals, financial condition, customer information or lists, or pricing formula, whether communicated orally or in documentary or other tangible form.

      b.    <u>Duty of Confidentiality.</u>  Employee agrees to abstain, both directly and indirectly, from using, appropriating, or disclosing Advantor's Confidential Information to any other person or entity for any reason other than in connection with her/his position <u>and</u> for the benefit of Advantor.  The disclosure or improper use or improper copying of Confidential Information will result in immediate termination.   The prohibition against disclosing or improperly using Confidential Information continues indefinitely after termination of employment with Advantor, whether voluntarily or involuntarily.

      c.    <u>Return of Materials.</u>  Employee shall not remove Confidential Information from the premises, unless for use in connection with his/her employment with Advantor <u>and</u> for the benefit of Advantor.   Upon termination or resignation, Employee shall immediately return all Confidential Information in his/her possession, whether on her/his person or at any other location.

    3.    <u>Noncompetition.</u>  Employee agrees that he or she will not, within a period of two (2) years following termination of employment for any reason whatsoever, **directly or indirectly engage in any activity competitive to Advantor** (including temporary or independent contractor, permanent placement or any combination thereof) for Employee's benefit or in association in any capacity, including but not limited to, the capacity of an employee, agent, servant, independent contractor, partner, proprietor, or stockholder, with any person, business or firm engaged in a similar business to Advantor's within Texas, or any other markets in which Advantor engages in business.  Employee acknowledges that doing so in any manner would interfere with, disturb, decrease and otherwise jeopardize the ongoing business of Advantor and the customer or client goodwill associated with the [sic] Advantor's ongoing business in the foregoing locations, marketing or trade areas.   Employee also agrees not to engage in any activity which may tend to take away from or diminish the trade, the business or the good will of Advantor, nor will Employee divulge or give to any other person or firm the benefit or advantage of Advantor's confidential business methods, forms knowledge, information and experience acquired by Employee while employed by Advantor. Employee further agrees not to contact, pursue, call upon or solicit any personnel, clients or customers of the [sic] Advantor.

(Doc. 82-2 at 2-3) (emphasis added).[3]   The Employee Agreements also provided that they would be governed by Florida law.   (Doc. 82-2 at 3).

Under Florida law, the elements of a claim for tortious interference with a contract are: (1) the existence of an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the contract; (3) an intentional and unjustified interference by the defendant with the plaintiff's rights under the contract; and (4) damage to the plaintiff as a result of the interference.   *See, e.g.*, *Ace Pro Sound and Recording, LLC v. Albertson*, 512 F.Supp.2d 1259, 1268 (S.D.Fla. 2007).

DRS admits that it knew of the existence of the Employment Agreements when it hired Larson, Ellfeldt, and Alvarez, and therefore it does not dispute the second element of these claims However, DRS does dispute the other three elements, arguing that the Employment Agreements were unenforceable, that it did not interfere with them, and that Advantor has failed to produce evidence of damages.   The Court will address the elements in reverse order.

### 1.   Damages

In the Joint Pretrial Statement, Advantor asserts that it seeks to recover two categories of compensatory damages it allegedly suffered as a result of the tortious interference: (1) the lost profits it would have earned if it had continued to perform the maintenance contracts it had with the Air Force; and (2) the fees and costs it incurred in suing Larson, Ellfeldt, and Alvarez to enforce the Employment Agreements.[4]   (Doc. 158 at 8-9).

---

[3] The quoted text is taken from Larson's Employment Agreement.   The Employment Agreements of Ellfeldt (Doc. 82-3) and Alvarez (Doc. 82-4) have slightly different wording but are identical in every material respect.

[4] Advantor also seeks punitive damages and prejudgment interest.   *Id.*

The alleged tortious interference has absolutely no logical relationship to any profits Advantor may have lost as a result of the termination of their Air Force maintenance contracts. Even assuming *arguendo* that tortious interference occurred, it would have happened *after* the decision was made to take the contracts away from Advantor and put them up for bid. It is undisputed that Larson, Ellfeldt, and Alvarez were hired after DRS had been awarded the SPAWAR contract. Advantor cannot argue that the alleged tortious interference was a cause of that decision, or a cause of the decision to exclude Advantor from the bidding. Accordingly, Advantor cannot recover these lost profits in connection with Count II, III, or IV.

Advantor's attempt to recover the fees and costs incurred in attempting to enforce the Employment Agreements against Larson, Ellfeldt, and Alvarez is also barred. Under Florida law, attorneys' fees are only recoverable pursuant to a contractual agreement or statutory authority, and there is no contract or statute that would permit an award of fees to Advantor if it were to prevail on these tortious interference claims. *See Bauer v. DILIB, Inc.*, 16 So. 3d 318, 319 (Fla. 4th DCA 2009) (holding that state statute authorizing an award of fees in a suit to enforce a restrictive covenant did not authorize such an award in a suit involving a claim of tortious interference with a contract containing a restrictive covenant).

Advantor's failure to show that it suffered any damages as a result of the alleged tortious interference is fatal to those claims. Accordingly, DRS is entitled to summary judgment on Counts II-IV. Although the absence of damages settles the issue of tortious interference, the Court will address DRS's remaining arguments.

### 2.        Interference

Advantor contends that the three employees breached their respective Employment Agreements by "performing the same work on the same bases as they performed during their

employment with [Advantor]." (Doc. 125 at 25-26). The flaw in this argument is that by doing so, the trio was not "directly or indirectly engag[ing] in any activity competitive to Advantor," which is the activity prohibited by the "Noncompetition" clause of the Employment Agreement. By the time DRS hired Larson, Alvarez, and Ellfeldt, SPAWAR had already awarded the contract to DRS – thereby selecting DRS to perform, *inter alia*, the work that the trio had been performing while employed by Advantor. Advantor had not even been eligible to bid on the SPAWAR contract. Even though they were being hired to perform "the same work on the same bases as they performed during their employment" with Advantor, Larson, Ellfeldt and Alvarez were not competing with their former employer because their former employer could no longer do those jobs. DRS is entitled to summary judgment in its favor that it did not tortiously interfere with the Noncompetition clauses of the Employment Agreements.[5]

### 3.  Enforceability

Under Florida law, a party seeking to enforce a restrictive covenant, such as a noncompete agreement, must plead and prove the existence of one or more "legitimate business interests"

---

[5] It is not clear from the papers whether Advantor is attempting to argue that DRS interfered with only the Noncompetition provisions of the Employment Agreements (by hiring Larson, Ellfeldt, and Alvarez) or with both those provisions and the Confidentiality provisions (by inducing them to reveal confidential information). The point is somewhat moot, as the failure to show damages forecloses both of these arguments. However, while the Noncompetition provision only prohibits activity competitive to Advantor, the Confidentiality provision is not so limited. Disclosure of confidential information is barred even to non-competitors. (*See* Doc. 82 at 2-3). The fact that DRS and Advantor were not competitors in regard to the SPAWAR contract would not be dispositive of a claim that DRS tortiously interfered with the Confidentiality provisions. Accordingly, the Court's conclusion as to this point reaches only the Noncompetition provision.

It should be noted that DRS does argue that Advantor has failed to show that it intended to tortiously interfere with the Employment Agreements – an argument that would apply to both provisions. However, the Court finds that genuine issues of material fact preclude summary judgment as to the issue of DRS's intent.

justifying such a restriction and that the restriction is reasonably necessary to protect those

interests.   Fla. Stat. § 542.335(1)(b).   The statute defines "legitimate business interests" as

including (but not being limited to):

> 1. Trade secrets, as defined in [Fla. Stat. §] 688.002(4).
>
> 2. Valuable confidential business or professional information that otherwise does not qualify as trade secrets.
>
> 3. Substantial relationships with specific prospective or existing customers, patients, or clients.
>
> 4. Customer, patient, or client goodwill associated with:
>
> > a. An ongoing business or professional practice, by way of trade name, trademark, service mark, or "trade dress";
> >
> > b. A specific geographic location; or
> >
> > c. A specific marketing or trade area.
>
> 5. Extraordinary or specialized training.

*Id.*   To be enforceable, contracts that restrict or prohibit competition must be reasonable as to

their duration, geographic scope, and line of business.   Fla. Stat. § 542.335(1).

DRS argues that the Employment Agreements did not protect legitimate business interests

because, *inter alia*, Larson, Ellfeldt, and Alvarez did not have access to confidential information.

However, Advantor asserts that all three of these employees received specialized training and had

client relations information and goodwill, all of which meet the statutory definition of "legitimate

business interest."   (Doc. 125 at 23-24).   On this record, the Court finds that genuine issues of

material fact remain as to whether the restrictive covenants were justified and therefore

enforceable, rendering summary judgment inappropriate as to this issue.

DRS also argues that the Employment Agreements were unenforceable because they were

overly broad.   But the reasonableness of a restrictive covenant is a question of fact, not law.

*Partylite Gifts, Inc. v. MacMillan*, 895 F.Supp.2d 1213, 1225 (M.D.Fla. 2012) (Whittemore, J.).

And even if a restrictive covenant is shown to be overbroad, it is not rendered unenforceable; instead, courts will modify the restriction and grant the relief necessary to protect the legitimate business interests.   Fla. Stat. § 542.335(1)(c).   As to this issue, DRS would not be entitled to summary judgment.

### C.   Florida's Uniform Trade Secrets Act

To prevail under FUTSA, the plaintiff must demonstrate that: (1) it possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it.   *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (citing Fla. Stat. § 688.002).   Under Florida law, a trade secret consists of information that (1) derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy." *American Red Cross v. Palm Beach Blood Bank, Inc.,* 143 F.3d 1407, 1410 (11th Cir.1998). However, if the information the plaintiff seeks to protect is generally known or readily accessible to third parties, it cannot qualify as a "trade secret." *See id.*

#### 1.   Manuals and Drawings

After DRS was awarded the SPAWAR Contract, the Air Force provided it with Advantor manuals and drawings it had in its possession.   Advantor contends that those items constitute trade secrets that were misappropriated by DRS.   In response, DRS argues that Advantor lost its property rights to the manuals when they were delivered to the government.

Advantor argues that the Air Force had no right to authorize the distribution or use of Advantor's manuals by DRS.   It appears that Advantor's real issue in regard to the manuals and drawings is with the Air Force, not DRS.   Advantor has failed to demonstrate that the information

in the manuals constituted trade secrets.   Moreover, since the manuals were provided by the Air Force to DRS after the SPAWAR Contract had been awarded, Advantor did not suffer any damage as a result of their misappropriation.

### 2.     Documents Received from Larson

One of the three former Advantor employees, Greg Larson, worked on an Air Force base for DRS for three days.   During that time, he sent six e-mails to Chris Cummings, the SPAWAR Program Manager.   Larson also sent DRS three email attachments of presentations as reflections of his work at Advantor.   There is no evidence that Larson ever trained anyone at DRS during the short time he was employed by there.

There is considerable doubt that the presentations and e-mails constitute trade secrets of Advantor.   For example, there is no mention of Advantor or its equipment in any of the presentations.   In addition, DRS denies utilizing any of the information provided by Larson, and Advantor has no evidence to the contrary.   Finally, Advantor has not provided any evidence of damage it suffered as a result of Larson's disclosures, precluding recovery as to this issue.

### 3.     Information Provided Pursuant to the NDA

Finally, Advantor argues that three documents it provided during the negotiations regarding its participation as a subcontractor (discussed *supra*) constitute trade secrets:   the lump sum price quote, the past performance information, and a document (originally prepared by DRS) confirming the Air Force bases that had Advantor security equipment on them.

DRS contends that the documents do not constitute trade secrets and were not misappropriated.   The lump sum price quote did not reveal any pricing information; Advantor has not shown that any of the past performance information (which was essentially marketing information) was not publicly available; and the list of Advantor equipment locations originated

from DRS.   In addition, it is undisputed that all of this information was given to DRS by Advantor voluntarily, rather than being acquired by improper means.   And once again, Advantor has not provided any evidence to show that it was damaged in any way by its disclosure of this information to DRS.   DRS is also entitled to summary judgment as to Count V.

**IV.    Conclusion**

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 112) is **GRANTED.**   All pending motions are **DENIED AS MOOT.**   The Clerk is directed to enter judgment in favor of DRS and close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 29, 2015.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party