[DO NOT PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT
_____

No. 15-14992
_____

D.C. Docket No. 6:14-cv-00533-GAP-DAB

ADVANTOR SYSTEMS CORPORATION,
a Florida Corporation,

Plaintiff - Appellant,

versus

DRS TECHNICAL SERVICES, INC.,
a Maryland Corporation,

Defendant - Appellee,

DRS TECHNOLOGIES, INC.,

Defendant.

_____

No. 16-11273
_____

D.C. Docket No. 6:14-cv-00533-GAP-DAB

ADVANTOR SYSTEMS CORPORATION,
a Florida Corporation,
HOLLAND & KNIGHT LLP,

Plaintiffs - Appellants,

versus

DRS TECHNICAL SERVICES, INC.,
a Maryland Corporation,

Defendant - Appellee,

DRS TECHNOLOGIES, INC.,
a Delaware Corporation,

Defendant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(January 31, 2017)

2

Before WILSON, JULIE CARNES and ROYAL,[*] Circuit Judges.

JULIE CARNES, Circuit Judge:

This consolidated appeal relates to a competitive dispute between Plaintiff-Appellant Advantor Systems and Defendant-Appellee DRS Technical Services, both of which are in the business of managing electronic security systems used on United States military bases.  Advantor claims that, over the course of about two years, DRS executed "a multi-pronged scheme to usurp Advantor's [preexisting] business" with the United States military.  In specific, DRS allegedly misappropriated proprietary information about Advantor systems and used that information to secure a major, consolidated military contract that ultimately replaced Advantor's longstanding military business.  Advantor maintains that this competitive "scheme" deprived Advantor of the profit it would have made through ongoing work with the military.

---

[*]  Honorable C. Ashley Royal, United States District Judge for the Middle District of Georgia, sitting by designation.

The district court granted summary judgment in DRS's favor on each of Advantor's three substantive claims against DRS.  Advantor appeals the court's grant of summary judgment and three related orders.  Upon careful review of the record and with the benefit of oral argument, we affirm in part and reverse in part.

## BACKGROUND

### I.   Facts

Advantor is principally engaged in the design and manufacture of so-called "intrusion detection systems," but it also provides ongoing support—including on-site maintenance and training—for the security systems it has installed.  DRS does not manufacture security systems itself; it is primarily involved in operating and maintaining systems manufactured by others.  Over the course of a decade, Advantor sold several of its proprietary "intrusion detection systems" ("IDS") to various United States Air Force bases and provided ongoing maintenance and support for those systems through individual service contracts.  Advantor's support of these systems included training government personnel in installation and maintenance techniques unique to Advantor's systems.  In so doing, Advantor supplied the Air Force with manuals and training materials that allegedly contained detailed data relating to Advantor's technology.

4

In mid-2013, the Space and Naval Warfare Systems Command
("SPAWAR")—the entity responsible for administering Navy and Air Force
security contracts—decided to consolidate the maintenance of security systems
across military bases through a single, all-encompassing contract rather than
individual contracts.  In July 2013, it issued a request for bids from eight
preexisting prime contractors.  DRS was eligible to bid for the consolidated
contract; Advantor was not.  There was never any question that the consolidated
SPAWAR contract would supplant each of Advantor's preexisting contracts with
the Air Force.  Thus, the only way Advantor could have retained its military
business post-consolidation would have been to subcontract with the entity that
won the consolidated project.

### A.   Subcontract Negotiations

DRS began preparing a bid for the SPAWAR contract in summer 2013.
DRS was aware that several of the military bases that would be covered by the
consolidated contract used technology and hardware manufactured by Advantor.
Accordingly, DRS began to solicit bids from manufacturers, including Advantor,
to subcontract with DRS to perform maintenance services.  In the course of
negotiations, DRS and Advantor entered into a non-disclosure agreement (the
"NDA") designed to facilitate the exchange of proprietary information.

The NDA contained two sets of provisions relevant to the underlying dispute.  The first provision states that information designated as "Proprietary Information" "shall be used solely for the purpose of discussing the [SPAWAR bid]."  The second provision is a "no direct hire" clause, which provides that, "during the term of this Agreement and for a one (1) year period thereafter, neither Party shall knowingly or actively seek to hire any employee of the other Party" except through indirect or general solicitation.

The proposal Advantor finally submitted comprised three pieces of information at issue in this case:  (1) a lump-sum quote of approximately $4.5M, the amount Advantor would charge DRS to continue providing technical support to the Air Force bases that used Advantor equipment; (2) a document identifying the Air Force bases that already housed Advantor equipment; and (3) a single-page document entitled "Past Performance," which included six high-level bullet points stating basic information regarding Advantor's business.

After receiving Advantor's quote, DRS concluded that it could price its bid for the consolidated contract more competitively if it resolved not to use Advantor as a subcontractor.  Thus, DRS decided internally to eliminate Advantor's involvement in the project.  Despite this change in its own plans, DRS continued to identify Advantor as a strategic partner in the text of its bid to SPAWAR.  DRS

ultimately won the SPAWAR contract at the end of September 2013.  As expected, the contract replaced each of Advantor's individual contracts at the Air Force bases it had previously served, effectively eliminating a large segment of Advantor's existing business.  Advantor alleges that DRS "us[ed] Advantor's pricing and past performance information without Advantor's consent"—and allegedly in violation of the NDA—to craft the "low-price bid" that enabled it to win the contract.

## B.    Hiring of Advantor Employees

DRS began work under the SPAWAR contract in October 2013, taking over security-system management at each of the Air Force bases Advantor had previously maintained.  At least one month prior to beginning this work, DRS began to recruit technicians familiar with the systems installed on the relevant bases.  To that end, DRS created an online job posting that went live in mid-August 2013.  The posting elicited 1,357 applications.  DRS ultimately hired fifty applicants, three of whom were existing Advantor employees looking for alternative employment (the "Advantor Employees").  The record reflects that these three employees made contact with DRS on their own initiative after reviewing the job posting or receiving a referral from a friend.  The Advantor Employees, however, were bound by employment agreements with Advantor that contained confidentiality and non-compete provisions.

7

Advantor alleges that DRS knew of these contracts and "intentionally induced" the Advantor Employees to breach both the confidentiality and non-compete provisions thereof by sharing their knowledge and expertise on Advantor system maintenance with DRS.  Advantor has already filed separate lawsuits against each of the Advantor Employees to enforce the employment agreements.  It now asserts a claim of tortious interference with contract against DRS, in addition to breach of the "no direct hire" clause of the NDA.

### C.    Use of Advantor Manuals and Drawings

Despite having already hired three former Advantor employees, DRS allegedly experienced "difficulty performing at Advantor sites due to its lack of expertise with Advantor's [ ] equipment" in January through March of 2014.  To assist in troubleshooting this equipment, DRS personnel acquired and referenced technical manuals Advantor had provided to the Air Force at the time it installed its proprietary systems.  Advantor also alleges that DRS used certain technical information provided by one of the Advantor Employees after he began to work at DRS.

Advantor does not dispute that it provided the Air Force with various manuals describing the operation and technical details of the security systems it had installed.  But it maintains that the Air Force had no right to distribute these

manuals to other contractors and that each manual bore a restrictive legend warning against dissemination.  It also points to evidence that DRS was aware that these manuals contained "trade secrets" and sought to procure them from its government contacts nonetheless.  On this basis, Advantor asserts a claim for violation of Florida's Uniform Trade Secrets Act ("FUTSA").

In Advantor's view, DRS's breach of the NDA, alleged interference with the Advantor Employees' employment agreements, and misappropriation of trade secrets injured Advantor by precluding it from participating as a subcontractor on the SPAWAR project and, further, by enabling DRS to win a second contract with SPAWAR when the initial engagement expired.

## II.    Procedural History

Advantor sued DRS in April 2014 on three separate claims:  breach of the NDA under Virginia law; tortious interference with contract under Florida law; and violation of Florida's Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.001–.009.  Advantor sought lost-profit, disgorgement, and punitive damages across these three claims.  The suit progressed through discovery, at which point the district court granted summary judgment in DRS's favor.  Advantor appeals the summary judgment determination in addition to three separate but related orders.

## A.    Financials Order

During discovery, Advantor repeatedly sought DRS's corporate financial information, including financials relating to the SPAWAR contract, in order to support its prayers for lost-profit, disgorgement, and punitive damages on its tortious interference and trade secrets claims.  In January 2015, the magistrate judge below issued an order denying Advantor's third motion to compel this information.  The district court upheld the magistrate's order, stating that "Advantor's persistent request for disclosure of Defendant's proprietary financial information exceeds the bounds of permissible discovery" because it is irrelevant to Advantor's claims.  Advantor seeks review of this order (the "Financials Order").

## B.    Expert Order

The district court also issued an order in September 2015 excluding the expert report and testimony of Advantor's economic expert following DRS's *Daubert* challenge (the "Expert Order").  The court again noted that the damages asserted were not relevant to Advantor's substantive claims.  Advantor argues that this testimony was directly relevant to its claims for lost profits and disgorgement damages, which it is entitled to seek under each of its causes of action.  Advantor seeks review of this order.

10

### C.    Summary Judgment Order

DRS ultimately moved for summary judgment under Fed. R. Civ. P. 56 on all counts before the case proceeded to trial.  The district court granted the motion in October 2015 on grounds addressed more fully in our discussion below. Advantor has appealed from the summary judgment order with respect to each of its substantive claims.

### D.    Sanctions Order

In response to the district court's adverse holdings, Advantor filed an emergency motion to stay enforcement of the summary judgment order pending appeal under Fed. R. Civ. P. 62.  In that motion, Advantor argued that enforcement of the summary judgment order was necessary to protect its trade secrets in the wake of the district court's finding that "Advantor has failed to demonstrate that the information [at issue] constituted trade secrets."

The district court denied the motion as "utterly baseless" and issued an order to show cause as to why Advantor and its counsel should not be sanctioned for the motion.  After briefing and a hearing, the court affirmed its "belief that the Motion to Stay was objectively baseless and without merit," stated that Advantor and its counsel are "hereby SANCTIONED," and directed Advantor to pay DRS its costs

for defending the motion (the "Sanctions Order").  Advantor and its counsel now

appeal the Sanctions Order.

## STANDARDS OF REVIEW

We review a district court's grant of summary judgment *de novo*.  *Zibtulda,*

*LLC v. Gwinnett Cty.*, 411 F.3d 1278, 1281 (11th Cir. 2005).  "Summary judgment

is appropriate when 'there is no genuine issue as to any material fact and . . . the

moving party is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56(c).

"In examining the record, we view the evidence in the light most favorable to the

non-moving party."  *Zibtulda*, 411 F.3d at 1281.

We review a district court's orders on motions to compel discovery,

admission of expert evidence, and sanctions for an abuse of discretion.  *See*

*Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, & Stevens, P.A.*, 525

F.3d 1107, 1116 (11th Cir. 2008) (citing *Castle v. Sangamo Weston, Inc.*, 744 F.2d

1464, 1466 (11th Cir. 1984)); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997);

*Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254, 1258 (11th Cir. 2012).

## DISCUSSION

The record in this case is voluminous, and each party has vigorously

disputed the other's characterization of the facts.  Our task in this appeal is, first

and foremost, to clarify Advantor's core theories of liability and to identify

whether the record contains facts sufficient to support those theories.  Because our findings on the merits of Advantor's claims impact our analysis of the Financials Order, the Expert Order, and the Sanctions Order, our discussion begins with our *de novo* review of the court's summary judgment findings.

## I.     Summary Judgment

The district court granted summary judgment in DRS's favor on each of Advantor's three substantive claims.  We discuss each in turn.

### A.     Breach of Non-Disclosure Agreement

Advantor contends that DRS breached two distinct clauses of the parties' NDA:  the provision limiting disclosure of information deemed "proprietary" (the "Proprietary Information Provision"), and the clause prohibiting direct hiring of the other party's employees (the "No Direct Hire Clause").

There is no dispute that the NDA is governed by Virginia law.  In Virginia, there are three elements of a breach of contract claim:  "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004).  The parties do not dispute that the NDA is enforceable; as such, the only question is whether DRS breached the terms of the agreement and injured Advantor thereby.

13

We agree with the district court that, even when viewed in the light most favorable to Advantor, the undisputed evidence does not demonstrate that DRS breached either section of the NDA.  Adopting the district court's analysis, we AFFIRM its grant of summary judgment to DRS on Advantor's claim that DRS breached the NDA.

### B.    Tortious Interference with Employment Agreements

Advantor next contends that DRS tortiously interfered with each of the Advantor Employees' employment agreements (the "Employment Agreements") under Florida law.  Two sets of provisions are at issue: a confidentiality provision and a non-compete clause.[1]  The confidentiality provision provides:

> Employee agrees to *abstain, both directly and indirectly, from using, appropriating, or disclosing Advantor's Confidential Information to any other person or entity for any reason other than in connection with his/her position <u>and</u> for the benefit of Advantor*. . . . The prohibition against disclosing or improperly using Confidential Information continues indefinitely . . . .

(Emphasis added.)  "Confidential Information" is defined as "information not available to the public relating to Advantor's business including, but not limited to,

---

[1]  Note that Advantor asserts three counts of tortious interference relating to three separate employment agreements, one for each of the "poached" Advantor Employees.  The language is slightly different in each agreement, but the relevant provisions are substantively identical.  We cite only to the agreement of Gregory Larson.

14

technical, marketing, sales programs or strategies, products, designs, plans,

concepts, reports, proposals, financial condition, customer information or lists, or

pricing formula."

> The non-compete clause provides:
>
> Employee agrees that he or she *will not, within a period of two (2) years* following termination of employment for any reason whatsoever, *directly or indirectly engage in any activity competitive to Advantor* (including temporary or independent contractor, permanent placement or any combination thereof) *for Employee's benefit or in association* in any capacity, including but not limited to, the capacity of an employee, agent, servant, independent contractor, partner, proprietor, or stockholder, *with any person, business or firm engaged in a similar business to Advantor's within . . . any [ ] markets in which Advantor engages in business.*

(Emphasis added.)

There is no dispute that Florida law applies to the tortious interference claim.

Under Florida law, the tort of contractual interference occurs when the defendant

(1) has knowledge of (2) an enforceable contract between the plaintiff and a third

party and (3) intentionally and (4) unjustifiably interferes with the plaintiff's rights

under that contract, (5) thereby causing the plaintiff injury.  *See Mariscotti v.*

*Merco Grp. at Akoya, Inc.*, 917 So. 2d 890, 892 (Fla. 3d DCA 2005).  "Imbedded

within these elements is the requirement that the plaintiff establish that the

defendant's conduct caused or induced the breach [of contract] that resulted in the

plaintiff's damages."  *Chicago Title Ins. Co. v. Alday-Donalson Title Co. of Fla.,*

*Inc.*, 832 So. 2d 810, 814 (Fla. 2d DCA 2002) (citing *St. Johns River Water Mgmt.*

*Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500, 504 (Fla. 5th DCA

2001)).  Neither of the first two elements is at issue in this appeal.[2]  We consider

the three remaining elements of the claim in turn.

### 1.    *Intent to Interfere*

A plaintiff alleging tortious interference must show specific intent to

interfere with contract; mere negligence is not enough.  *See Fla. Power & Light*

*Co. v. Fleitas*, 488 So. 2d 148, 151 (Fla. 3d DCA 1986); *Chicago Title Ins.*, 832

So. 2d at 814.[3]  Furthermore, mere awareness of a non-compete agreement at the

time of hire is not sufficient to support a tortious interference claim.  *See*

*Fiberglass Coatings, Inc. v. Interstate Chem., Inc.*, 16 So. 3d 836, 838–39 (Fla. 2d

DCA 2009).

The district court found that genuine fact issues precluded summary

judgment as to DRS's intent.  We agree and find that a fact dispute remains as to

---

[2]  As to the first element, DRS does not dispute that it had knowledge of the Agreements in place between Advantor and each of the Advantor Employees at the time DRS hired them.  As to the second element, DRS does not challenge on appeal the enforceability of the agreements, so we do not consider that issue here.

[3]  Some of the cases cited in this analysis relate to Florida's cause of action for tortious interference with business relationship.  Courts have found that the elements and standards of that cause of action apply with equal force to the cause for tortious interference with contract. *See, e.g.*, *Smith v. Ocean State Bank*, 335 So. 2d 641, 642 (Fla. 1st DCA 1975).

whether DRS intended to interfere with the Agreements by (1) continuing to
recruit the Advantor Employees once it learned of the restrictive covenants;
(2) hiring the Advantor Employees despite its awareness that it stood in a
competitive position with respect to Advantor; and (3) allowing (indeed,
expecting) the Advantor Employees to share with DRS their expertise in working
with Advantor systems, despite the possibility that certain of that information
might be considered confidential under the Agreements.

A few aspects of the record make clear that these questions warrant
examination by a factfinder.  First, there is clear evidence that DRS was aware of
the Advantor Employees' potential liability under the confidentiality and non-
compete provisions.  For example, during the recruitment process, a DRS
employee told one of the Advantor Employees not to worry about possible
competitive implications under his Agreement because DRS would "blow
Advantor away."  And at least one internal DRS document shows that DRS viewed
Advantor as an indirect competitor at the time it decided to employ the Advantor
Employees, signaling that it was on notice of and disregarded the possibility that
their hiring might run afoul of the non-compete clause.  The record also suggests
that DRS was highly motivated to hire the Advantor Employees precisely because

they held unique knowledge of Advantor systems that DRS would not be able to get elsewhere.

As Advantor has shown, DRS viewed the Advantor Employees as critical to DRS's performance under the SPAWAR contract, and each of the Advantor Employees was considered a high-priority hire. This undisputed evidence could support a rational factfinder's conclusion that DRS possessed the requisite intent to interfere with the Agreements once it became aware of them.[4]

### 2.    *Interference*

The next question is whether there is evidence of actual interference with the Employment Agreements. We can distill this to a simple inquiry: Did the Advantor Employees breach the confidentiality provision and/or the non-compete clause when they worked on Advantor equipment for DRS's benefit? If there was no underlying breach, there was no interference. *Chicago Title Ins.*, 832 So. 2d at 814 ("Imbedded within these elements is the requirement that the plaintiff establish

---

[4] We have considered and reject DRS's counterarguments. In its brief on appeal, DRS crafts the timeline far too narrowly and ignores several of the record facts that suggest specific intent. It asserts that it did not know of the Agreements until after the Advantor Employees applied for the job, and that DRS did not actively pursue their recruitment. But Advantor's allegations relate to DRS's decision to hire the Advantor Employees away from Advantor and to make use of their unique expertise *after* it learned of the Agreements. DRS's arguments on this point largely miss the mark.

18

that the defendant's conduct caused or induced the breach that resulted in the plaintiff's damages.") (citing *St. Johns River Water Mgmt. Dist.*, 784 So. 2d at 504).  We consider the terms of each provision separately.

*a.*   <u>*Non-Compete Clause*</u>

The non-compete clause prohibits employees from engaging "directly or indirectly [ ] in any activity competitive to Advantor," including during employment by any business "engaged in a similar business to Advantor's within any [ ] markets in which Advantor engages in business."  There is no dispute as to the nature of the parties' work, and the facts make clear that the parties were "engaged in a similar business" when the alleged poaching occurred.  The remaining question, then, is whether the Advantor Employees engaged directly or indirectly in activity competitive to Advantor.

Unlike the district court, we conclude that a factual dispute exists as to whether Advantor and DRS were competitors during the relevant time period.  Advantor identifies four sets of undisputed facts regarding DRS's competitive posture vis-à-vis DRS.  First, it notes that DRS viewed Advantor internally as its competitor in the market for military security systems, pointing to an email from the relevant timeframe in which a DRS program manager stated that Advantor has "a proprietary system that is installed at some locations [DRS] is currently

19

supporting, and *they are our competitor*."  (Emphasis added.)  DRS itself interprets this email as signaling that "DRS may compete with Advantor in some contexts" even though they did not directly compete for the primary SPAWAR contract itself.

Second, Advantor notes that, even after DRS won the SPAWAR contract, Advantor continued to perform warranty work at the Air Force bases on which its systems were installed.  DRS does not dispute this fact, nor does it deny Advantor's assertion that "the three defecting employees would have done [this work] for Advantor had they not been hired away."

Third, as Advantor observes, "the district court incorrectly assumed that DRS had permanently obtained the right to perform IDS maintenance at the 19 Advantor sites at issue."  As the record shows, the original consolidated contract was designed to last only one year; the contract came up for renewal in September 2014.  While DRS did ultimately win renewal of the contract for a second year, SPAWAR was free at the end of the first year to reopen bidding to other general contractors that might have chosen to work with Advantor, or even to revert to the individual-contract model.  DRS does not deny that opportunities existed for Advantor to regain some of its prior work as a subcontractor, or even a prime

20

contractor, in later years.  Nor does DRS deny Advantor's assertion that Advantor stood to win maintenance work at non-SPAWAR sites at all relevant times.

Finally, Advantor argues that the SPAWAR contract contained a "Certification Requirement" that had the effect of requiring Advantor-certified personnel to perform technical work on Advantor systems.  The parties do not agree on the proper interpretation of this provision, but DRS's bid to SPAWAR clearly stated that "DRS acknowledges the critical requirements for manufacturer certifications for the . . . Advantor systems."  The bid also represented to the Air Force that "Advantor is a strategic partner for DRS"—a representation that became untruthful but that DRS apparently considered important to its chances of being awarded the contract.

Despite this evidence, the district court concluded:  "The flaw in [Advantor's] argument" is that, by working on Advantor equipment as DRS employees, the Advantor Employees "were not 'directly or indirectly engag[ing] in any activity competitive to Advantor.'"  The court based this finding on its conclusion that, "[b]y the time DRS hired [the Advantor Employees], SPAWAR

21

had already awarded the contract to DRS," and therefore DRS was not in a competitive position vis-à-vis Advantor at the time of the alleged breach.[5]

But the facts cited here suggest (among other things) that even after SPAWAR decided to give DRS the consolidated contract, DRS and Advantor were poised to compete on at least three levels:  (1) for the work maintaining Advantor equipment under the SPAWAR contract; (2) for the ability to perform maintenance on Advantor systems at non-SPAWAR sites (*i.e.*, United States government sites not covered by the SPAWAR consolidated contract); and (3) for the right to work either as a subcontractor or a direct contractor for SPAWAR once DRS's initial one-year contract expired and bidding reopened.  A factfinder could conclude that the Advantor Employees were engaged "directly or indirectly" in activity that was competitive to Advantor when DRS hired them and used them to develop in-house expertise with Advantor systems.  It is also fair to conclude that, in so doing, DRS gained competitive ground against Advantor, even though Advantor was not eligible to become SPAWAR's prime contractor during the initial round of bidding.

---

[5]  DRS embraces this reasoning wholesale and does not squarely address Advantor's contrary arguments regarding the parties' competitive posture.

Considering the full scope of the competitive picture in this case, we reverse the district court's finding because, when viewed in a light favorable to Advantor, the evidence suggests that the Advantor Employees were engaged in activity competitive to Advantor.

### b.    *Confidentiality Provision*

The district court declined to rule on Advantor's claim that the Advantor Employees disseminated confidential Advantor information in violation of the confidentiality provision.  In light of this gap in the lower court's analysis, we remand Advantor's claims regarding the confidentiality provision for review by the district court in the first instance.

### 3.    *Injury and Causation*

To establish tortious interference, Advantor must further show that the breach DRS induced actually "resulted in the plaintiff's damages."  *Chicago Title Ins.*, 832 So. 2d at 814 (citing *St. Johns River Water Mgmt. Dist.*, 784 So. 2d at 504).  The district court concluded that, even if there was interference, the Advantor Employees' breach of the Employment Agreements did not result in any cognizable damage to Advantor.  Our analysis of the parties' competitive posture and the record before us compels us to conclude the opposite.

It is crucial to clarify the precise theory of injury and causation Advantor has articulated in this litigation.  Advantor's argument for lost profits and/or disgorgement damages is as follows.  But for DRS's interference with the Employment Agreements, DRS would not have been able to assemble the in-house expertise needed to service the Advantor systems that were already installed on several SPAWAR sites.  And if DRS lacked the ability to "self-perform" with respect to Advantor equipment, it would have had no choice but to subcontract with Advantor in order to meet its obligations toward SPAWAR.  Resolving to self-perform a role Advantor would otherwise have been hired to do also allowed DRS to submit a below-average bid quote, which allowed it to win the SPAWAR contract over other eligible bidders (at least one of which had agreed to partner with Advantor).  Thus, Advantor alleges, it lost the opportunity to perform work that it would otherwise have been hired to do.

Put differently, Advantor suggests that its employees possessed specialized and non-public knowledge about its own systems without which no other entity could properly maintain an Advantor system, and that DRS knowingly undermined Advantor's attempts to protect that knowledge.  DRS's conduct thus robbed Advantor of the benefits that would have flowed from its veritable monopoly in the realm of Advantor system service.  Furthermore, because DRS's self-performance

24

was so successful during the initial year of the SPAWAR contract that DRS won the work again in subsequent years, DRS continued to rob Advantor of work it otherwise would have been uniquely positioned to do.

The argument is not that Advantor merely lost an opportunity to compete for future SPAWAR business.  The argument is that SPAWAR or its prime contractor, DRS, would inevitably have had to hire Advantor if not for DRS's pilfering of its proprietary expertise.  (Alternatively, if not for DRS's misconduct, Advantor would have been able to withhold technical service of Advantor systems and thus induce the Air Force to reinstate Advantor's prior contracts or to require DRS to subcontract with Advantor directly.)

The district court concluded that there is "no logical relationship" between DRS's alleged inducement of the Advantor Employees' breaches, on the one hand, and the loss of potential business for Advantor, on the other.[6]  To the contrary, we find Advantor's theory of causation logical and conclude that the question whether Advantor's loss of business was, in fact, caused by DRS's conduct should be put to a factfinder.  On the evidence presented, a factfinder could conclude that Advantor

---

[6]  DRS's brief on appeal embraces the district court's analysis wholesale and does not squarely confront Advantor's more nuanced causation theory.

would have been hired in some capacity on the SPAWAR project if not for DRS's

aggressive efforts to develop the know-how to perform Advantor service work

itself.  At a minimum, the factual ambiguity on these points makes summary

judgment inappropriate.

Several parts of the record support this conclusion.  First, Advantor notes

that SPAWAR's request for quotes for the consolidated contract (the "RFQ")

contained a "Certification Requirement," which stated that

> [p]ersonnel shall be qualified to make repairs on the IDS equipment to be
> serviced, inspected, and maintained.  In addition, personnel performing
> annunciator maintenance shall have current A7S AEL approved annunciator
> certification for IDS components, including annunciator software used at the
> identified bases.[7]

The record establishes that only Advantor personnel, military customers, and

chosen subcontractors are eligible to receive training to become certified in

maintaining Advantor IDS systems, and certifications expire as soon as the trained

individual leaves Advantor or upon the termination of the project for which

certification was obtained.

Advantor claims that that because the RFQ required that personnel providing

IDS services on the nineteen Air Force bases "shall have current A7S AEL

---

[7] An "annunciator" is a technical component of an IDS.  Advantor manufactured many of the
annunciators located on the relevant Air Force bases.

approved annunciator certification," only Advantor or one of its certified

subcontractors could maintain Advantor systems under the original plan for the

consolidated contract.  DRS disputes this interpretation, and the record evidence

conflicts as to whether the RFQ intended to require that the prime contractor hire

technicians with active Advantor certifications.  Notably, however, the language of

DRS's bid suggests that DRS was operating under the assumption that the military

expected Advantor to play a continued role in the project:  "DRS acknowledges the

critical requirements for manufacturer certifications for the Vindicator and

Advantor systems which are common as the USAF fielded IBDSS system."  The

bid also represented to the Air Force that "Advantor is a strategic partner for

DRS," confirming that both DRS and the Air Force viewed Advantor's continued

involvement at the subcontract level as a component of the consolidation plan.

        Furthermore, there is evidence to suggest that other subcontractors could not

have performed this work in Advantor's stead, and that DRS would have been

unable to acquire enough technical information regarding Advantor systems to

"self-perform" without committing the misconduct at issue.  Discussion about

Advantor employees found in several internal DRS emails—the content and

meaning of which are not in dispute—demonstrates how valuable Advantor

expertise was to DRS:

27

- "All, It is extremely important that we treat Greg like GOLD and make sure his transition to DRS is as smooth as possible.  I know we strive to do this with everyone, as we should, but please pay special attention to Greg and make sure we get him on board quickly.  *He is key to our ability to support Advantor systems*."  (Emphasis added.)

- "I need to adjust Axel Alvarez's offer to a $28.85/ hour rate.  I apologize for any inconvenience this has caused, but *this is a critical candidate for our USAF IBDSS maintenance program supporting Edwards AFB*.  I got some hesitation from this critical candidate even though we have already been through the salary discussion."  (Emphasis added.)

- "I got a call from Axel about the B-2 Hangar installation at Edwards.  *He has run into some technical issues and doesn't know how to design the system to accommodate them*.  He was asking me how to solve the problem, but I obviously don't have any experience with this system. . . . [E]ssentially *he doesn't know how to make an Advantor system work in this environment. . . . [W]e don't have anyone on staff that has Advantor design experience or any ability to go to Advantor directly for support.  I'm concerned that we may be in over our heads with this design task . . . .*"  (Emphasis added.)

Testimony from one DRS witness confirmed that DRS viewed the Advantor Employees as high-priority, "A plus" recruits who were needed to ensure there was "no lapse in coverage" at the relevant military bases.

Another set of emails exchanged shortly after DRS won the SPAWAR contract shows that, in order to meet its obligations under the contract, it had to either hire Advantor as a subcontractor or hire Advantor-trained techs who would bring Advantor expertise to DRS's sites.  In one message, SPAWAR officials noted that "DRS has a teaming agreement with Advantor for them to do the

28

support" but there are "down-side[s] to this" agreement, including the fact that "[i]t

will impact schedules . . . because [Advantor technicians] are the only ones

certified there is no repercussions for them for missing response times."  It

continues:

> DRS has technicians that are trained on Advantor . . . . However Advantor
> does not certify any techs but their own.  Our recommendation is that you
> allow us to staff positions with Advantor-experienced techs that are DRS
> employees so that they can meet the critical response times, and when a
> problem is something that requires a specific certified tech (as in, it would
> void a warrantee or is something so intrinsic that only a current Advantor
> employee would know about) then DRS would call Advantor and bring in
> one of their techs through their sub-contract agreement.

The author of the email later reiterates:  "I recommend that we be allowed to staff

the primary support with DRS techs that are experienced in supporting Advantor

(some are current Advantor techs looking for a change), and then pull in Advantor

as a sub when necessary."  Viewed in the light most favorable to Advantor, these

emails—the content and meaning of which are undisputed—suggest that, if DRS

had not been able to hire technicians with meaningful Advantor expertise, they

would have had no choice but to hire Advantor itself.

We reiterate that Advantor's arguments regarding injury and causation may

not succeed at trial.  But given our analysis, we conclude that a reasonable

factfinder could interpret the relevant internal emails, coupled with the Air Force's

RFQ requirement and DRS's bid language, as compelling evidence that DRS

might have been required—by the Air Force or out of practical necessity—to hire
Advantor if not for its poaching of the Advantor Employees.  This would logically
support an argument that DRS's interference resulted in loss of business for
Advantor, justifying Advantor's prayers for lost-profit or disgorgement damages.

We conclude that the district court erred in finding that Advantor does not
have a "logical" theory of causation for lost profits.  The theory is logical.  At a
minimum, fact questions remain regarding whether Advantor would have been
hired in some capacity if not for the poaching of the Advantor Employees.

Because genuine disputes of material fact exist as to the critical elements of
the tortious interference claim, we find that summary judgment on this claim was
improper.  As such, we REVERSE the district court's grant of summary judgment
for DRS on the tortious interference claim.

### C.   Misappropriation of Trade Secrets

Advantor's final claim is that DRS violated Florida's Uniform Trade Secrets
Act ("FUTSA"), Fla. Stat. § 688.001–009.  Advantor characterizes three sets of
information as misappropriated "trade secrets":  (a) the information contained in
Advantor's subcontract proposal, which DRS allegedly used to exclude Advantor
from the SPAWAR project (the "Subcontract Information"); (b) technical manuals
and drawings that the Air Force handed over to DRS when it won the contract,

30

which DRS distributed to its technicians and used to service Advantor equipment

(the "Manuals"); and (c)  technical information sent via email by Greg Larson, one

of the Advantor Employees, to DRS once he began working there (the "Larson

Information").  DRS allegedly used the latter two sets of information to

successfully maintain Advantor equipment without having to subcontract with

Advantor.

To prevail on a FUTSA claim, a plaintiff must demonstrate that (1) it

possessed a "trade secret" and (2) the secret was misappropriated.  Fla. Stat.

§ 688.002; *see Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407,

1410 (11th Cir. 1998) (applying Florida law).  "Trade secret" means any

information (including methods, techniques, or processes) that (a) derives

independent economic value from not being generally known or readily

ascertainable and (b) is the subject of reasonable efforts to maintain its secrecy.

Fla. Stat. § 688.002(4); *see Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*,

10 So. 3d 202, 205 (Fla. 4th DCA 2009).  "Misappropriation" generally means that

the secret was acquired by someone who knows or has reason to know that the

secret was improperly obtained or who used improper means to obtain it.  *See*

Fla. Stat. § 688.002(2).

Damages for a FUTSA violation "can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation."[8] Fla. Stat. § 688.004(1).  In pursuing such damages, "[a] plaintiff's burden of proof . . . is 'liberal' and is satisfied by showing the misappropriation, the subsequent commercial use, and . . . evidence by which the jury can value the rights the defendant has obtained."  *Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 94 So. 3d 640, 644 (Fla. 4th DCA 2012) (citing *Perdue Farms Inc. v. Hook*, 777 So. 2d 1047, 1051 (Fla. 2d DCA 2001)).  The statute also permits punitive damages "[i]f willful and malicious misappropriation exists."  Fla. Stat. § 688.004(2).  There are three sets of alleged trade secrets; we consider them separately.

### 1.   *Subcontract Information*

Advantor alleges a FUTSA violation with respect to three pieces of information contained in its subcontract proposal: a price quote, a list of Air Force bases on which Advantor systems were installed, and a "Past Performance" document containing a few high-level details about Advantor's business.  The

---

[8]  The statute also provides that, "in lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."  Fla. Stat. § 688.004(1).  Advantor has not requested royalty damages.

district court's finding that DRS did not violate FUTSA with respect to this information was without error, as it is clear on the current record that none of the Subcontract Information "derives independent economic value from not being generally known or readily ascertainable."  Fla. Stat. § 688.002(4)(a).

Price quote.  The lump-sum price quote was offered voluntarily for the purpose of negotiating a possible deal with DRS.  It was non-specific and was not broken down into component pricing parts; it revealed little, if anything, about Advantor's internal pricing or marketing strategies.  More importantly, it does not have "independent economic value" by virtue of its secrecy:  A price quote generates potential economic value only when it is shared with prospective business partner.  This quote qua quote simply had no independent value except when disclosed in the context of bilateral negotiation.

List of Advantor sites.  The document listing Advantor's Air Force sites originated from DRS, and Advantor makes no assertions to the contrary.  Thus, it cannot possibly have been valuable to Advantor by virtue of the fact that DRS did not possess it.

"Past Performance" document.  Finally, the record suggests that the "Past Performance" information included in Advantor's subcontract proposal was publicly available, and Advantor does not offer evidence to the contrary.

33

Definitionally, then, it is not a "trade secret." Fla. Stat. § 688.002(4)(a). *See also, e.g.*, *Templeton v. Creative Loafing Tampa, Inc.*, 552 So. 2d 288, 289–90 (Fla. 2d DCA 1989) (customer list was not a trade secret because it could be derived from public publications); *Health Care Mgmt. Consulting, Inc. v. McCombes*, 661 So. 2d 1223, 1226 (Fla. 1st DCA 1995) (summaries of Medicare regulations were not trade secrets because content could be ascertained by researching the relevant law, even though summaries involved some interpretation).

Because the Subcontract Information did not include "trade secrets," DRS could not have violated FUTSA by "using" it, even if Advantor had protected its confidentiality and DRS had misappropriated it. The district court did not err in granting summary judgment on Advantor's FUTSA claim with respect to the Subcontract Information, and we AFFIRM accordingly.

### 2.    *Manuals*

Advantor next argues that DRS violated FUTSA when it received from the Air Force certain technical manuals and drawings (the "Manuals") regarding Advantor systems, broadly disseminated them to its technicians, and used them to service Advantor equipment under the SPAWAR contract. It is important at the outset to identify the documents at the heart of this claim. There is no dispute that

this subset of documents contains operational manuals supplied to the Air Force upon installation of Advantor systems, including "quick reference guides" and drawings.  An Advantor corporate president testified that the "manuals associated with our IDS equipment are detailed and lengthy technical documents, containing multiple chapters and intricate details to these protected products and contain proprietary, restrictive disclosure markings."  DRS does not provide an alternative or conflicting characterization of the Manuals.

The record is voluminous, and we are unable to determine which specific Manuals were received by and disseminated within DRS or when such dissemination occurred.  But it is clear that DRS received a number of Manuals from at least one military employee shortly after undertaking the SPAWAR contract; that DRS personnel found certain of the Manuals useful; and that DRS managers discussed a plan for disseminating the Manuals broadly across Advantor sites without incurring liability.[9]  With this background in mind, we consider the elements of the FUTSA claim.

-------------------

[9]  For example, one DRS manager directly involved in the SPAWAR project admitted in his testimony that technicians employed at at least one Air Force base received Advantor operating materials from a military sergeant in order to help DRS service their equipment.  This testimony also makes clear that the Manuals were relevant to operations at all the former Advantor bases. Internal DRS emails further show that DRS managers discussed the fact that they had received

a.     *"Trade Secret"*

With no explanation as to how it reached its conclusion, the district court found that Advantor "failed to demonstrate that . . . the manuals constituted trade secrets." On a technical question such as this, the absence of analysis makes our task difficult. To constitute a trade secret, the information must "[d]erive independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by," parties that might benefit from their use, Fla. Stat. § 688.002(4)(a), and Advantor must have taken sufficient steps to protect the secrecy of the information. Fla. Stat. § 688.002(4)(b).

We first note that, as soon as it began experiencing technical problems with Advantor systems, DRS made several efforts to acquire the Manuals despite express concerns about their proprietary nature. Only after some internal debate, and the apparent involvement of the SPAWAR legal department, did Air Force personnel forward the Manuals to DRS employees, who made plans to disseminate them widely to their technicians. DRS does not deny having taken these steps to acquire the technical information it needed to properly service Advantor equipment, and it provides no evidence that the technical data was available

---

the Manuals and strategized regarding the most efficient way to disseminate them across their Air Force sites in light of their confidentiality markings.

elsewhere during the relevant time period.  If DRS could readily have acquired the

information through an alternative, open source, it likely would not have

knowingly assumed the legal risk of accessing, copying, and disseminating the

Manuals in the first place.

DRS further attempts to persuade us that Advantor is in the habit of

"recklessly distribut[ing]" its technical materials and, as a result, failed to protect

the secrecy of the Manuals at issue.  The material facts on this point do not

conflict.  Advantor provides operations manuals to each of its customers at the

time it installs its systems, and it did so in this case.  Manuals are also provided to

Advantor employees and any other individuals, including military personnel and

subcontractors, who receive training from Advantor on its systems.  But this

dissemination is not haphazard.  The Manuals themselves bear confidentiality

legends; in fact, the existence of these legends was one of the reasons DRS

hesitated to disseminate the Manuals to its technicians.[10]  In fact, emails among

---

[10]  For example, a Manual entitled "Operator Quick Reference Guide" that was allegedly
disseminated to DRS technicians states on its second page:

> This information is intended solely for the individual or entity to which it is addressed
> and may contain confidential and/or privileged material.  Any review, transmission,
> dissemination or other use of or taking action in reliance upon this information by
> persons or entities other than the intended recipient is prohibited.  This document may be
> submitted to the Government under the provisions of the Limited Rights set forth in FAR

DRS personnel concluded that dissemination of certain Manuals across various SPAWAR sites would likely be a "[n]o go . . . because they have copyright or trademark statements on them" and resolved to discuss the dilemma with SPAWAR's legal department. The record also shows that, whenever Advantor conducts training seminars, it requires attendees to sign a sheet acknowledging that

> [t]he information provided in this training class . . . is considered Proprietary and Confidential to Advantor. These instructional materials also contain trade secret information of Advantor. This information may be used only for its intended purpose and may not be disclosed without . . . consent.

One of the Air Force officers who provided DRS with the Manuals had received and signed this notice. Under Florida law, a factfinder could conclude that this set of precautions (which DRS does not dispute) likely constitutes "reasonable efforts to maintain secrecy." Fla. Stat. § 688.002(4)(b). *See, e.g.*, *Premier Lab*, 10 So. 3d at 206 (holding that "the lack of a confidentiality agreement does not necessarily defeat [an] argument that [information] is a trade secret" because "[w]here an employee acquires, during the course of his employment, a special technique or process developed by his employer," he is under a duty not to use it to the

---

52.227-14, and must have appropriate Limited Rights Notice attached for any such submittal.

This Manual was forwarded to Axel Alvarez, one of the Advantor Employees, by Air Force personnel three months after DRS began work under the SPAWAR contract.

detriment of his employer).  *Cf.* 55 Fla. Jur. 2d Trademarks & Unfair Competition § 44 ("A trade secret owner who, upon delivering information to a state agency, fails to . . . specify in writing what information it contends is confidential . . . has not taken measures . . . to maintain the information's secrecy.").

### b.   *Misappropriation*

The next question, then, is whether the Air Force "owed a duty" to Advantor "to maintain [the Manuals'] secrecy or limit [their] use," and whether DRS "knew or had reason to know" of the Air Force's duty.  *See* Fla. Stat. § 688.002.  The parties argue that the answer to this question depends on whether the Air Force held legal rights in the Manuals, so we focus our analysis on that inquiry.  If the Air Force's rights in the Manuals were unlimited, as DRS contends, then it owed no duty to Advantor to limit the Manuals' distribution to non-Advantor service contractors.  DRS specifically argues that Advantor lost its right to control the Air Force's use of the Manuals when it sold its equipment to the Air Force and supplied it with operational manuals for its products.  If, however, the Air Force's rights were limited and DRS had reason to know of that limitation, as Advantor argues, then DRS's use may have constituted misappropriation.

The parties do not dispute that the applicable contracts do not incorporate any specific data rights clauses.  In the absence of clear contractual language, the

parties agree that the Air Force's rights in the Manuals are governed by the

Defense Federal Acquisition Regulations System (the "Defense Regulations").

These provisions clarify the default data rights the government holds in

commercial data provided by private contractors.  The Defense Regulations

framework requires us to look at three interconnecting provisions of Title 48 of the

Code of Federal Regulations:  § 252.227-7015 (outlining the government's rights

in various types of contractor data) and § 227.7102-1, -2 (further clarifying

government rights in distinct types of data).

      In relevant part, these provisions establish that "[t]he Government shall have

the *unrestricted right* to use, [ ] reproduce, release, . . . or disclose technical data,

and to permit others to do so, that . . . (ii) Are form, fit, and function data" ("FFF

Data") or that "(iv) Are necessary for operation, maintenance, installation, or

training" ("OMIT Data").  48 C.F.R. § 252.227-7015(b)(1) (emphasis added).

"Form, fit, and function data" is "data that describes the required overall physical,

functional, and performance characteristics . . . of an item, component, or process

to the extent necessary to permit identification of physically and functionally

interchangeable items."  48 C.F.R. § 252.227-7015(a)(3).

      If the Advantor data held by the Air Force does not qualify as FFF or OMIT

Data, then the Air Force is authorized to "use . . . or disclose technical data *within*

*the Government only*."  48 C.F.R. § 252.227-7015(b)(2) (emphasis added).  The

Government is also precluded from releasing, disclosing, or authorizing use of

such technical data "outside the Government without the Contractor's written

permission unless a release, disclosure, or permitted use is necessary . . . for

performance of work by covered Government support contractors."  48 C.F.R.

§ 252.227-7015(b)(2)(ii).

In short, if the Manuals contain exclusively FFF or OMIT Data, then the Air

Force had, by default, unrestricted rights to disclose the Manuals to DRS for the

purpose of helping the Air Force maintain its security systems.  *See* § 252.227-

7015(b)(1)(ii), (iv).  DRS argues that the Manuals fit squarely within the

definitions of FFF and/or OMIT Data, making the Air Force's dissemination

entirely proper under the Defense Regulations.  Advantor contends that the

Manuals contain detailed technical data beyond the FFF or OMIT Data categories,

which means that the Air Force may have overstepped the bounds of its data rights

by disseminating the Manuals to DRS personnel.  *See* § 252.227-7015(b)(2),

(b)(2)(ii).

Given this regulatory framework, we conclude that whether the Air Force

could have properly disseminated the Manuals is intensely factual, technical, and

legal in nature.  Because the district court resolved the FUTSA claim solely on its

41

determination that the Manuals cannot be viewed as trade secrets (as discussed

*supra*), it did not grapple with these central questions.  On remand, the district

court should address the question whether the Air Force could properly

disseminate the documents at issue to DRS.  If it concludes that the Air Force

could so act, then summary judgment for DRS would likely be appropriate as to

this claim.

### c.    *Injury and Causation*

The only remaining question is whether the alleged use of the Manuals

caused Advantor any injury for which lost-profit or disgorgement damages may be

appropriate under Fla. Stat. § 688.004(1).  Here, we echo our analysis of injury

causation in the context of Advantor's tortious interference claim:  The record

contains sufficient evidence to enable a factfinder to conclude that, but for DRS's

efforts to "self-perform" under the SPAWAR consolidated contract, Advantor

would have been hired in a subcontract capacity to serve the Air Force bases

running Advantor systems.  We also note that, under Florida law, "[a] plaintiff's

burden of proof" on a FUTSA claim "is 'liberal' and is satisfied by showing the

misappropriation, the subsequent commercial use, and . . . evidence by which the

jury can value the rights the defendant has obtained." *Premier Lab*, 94 So. 3d at

644 (citing *Perdue Farms*, 777 So. 2d at 1051).

In light of the above, we REVERSE the district court's grant of summary

judgment on Advantor's FUTSA claim with respect to the Manuals.

### 3.   *Larson Information*

Finally, Advantor alleges that DRS violated FUTSA by receiving and using

Advantor-specific information that was sent to DRS voluntarily by Greg Larson,

one of the Advantor Employees.  We concluded *supra* that only one subset of the

Larson Information—a series of emails Larson sent to DRS managers describing

"Advantor Concepts" and other information (the "Larson Emails")—may be

viewed as containing confidential, Advantor-specific information on the current

record.  That analysis holds true in the FUTSA context.  Thus, we consider only

whether the Larson Emails can form the basis of a FUTSA claim.

### a.   *"Trade Secret"*

The district court granted summary judgment on this claim, but explained

that ruling only by stating that there was "considerable doubt" that the materials

constituted trade secrets.  The district court's conclusion may ultimately be correct,

but we require more analysis than provided to determine if that is so.  Specifically,

the record suggests that at least some of the content of the Larson Emails applies

uniquely to Advantor equipment and is not publicly known.  For example,

Larson's email entitled "Advantor Concepts" notes that the processes he describes

43

are likely to "confuse new techs and techs unfamiliar with Advantor products,"
signaling that he viewed the information as unique to Advantor.  By contrast, DRS
asserts—without definitive evidence—that these concepts are "known by any
experienced technician."

Further, the confidentiality provision of Larson's employment agreement
supports an argument that Advantor maintained the secrecy of the Larson
Information.  The provision prohibited use of any information deemed
"confidential" "for any reason other than . . . for the benefit of Advantor."  This
prohibition extended "indefinitely" after Larson quit his job at Advantor.  Under
Florida law, the Provision was sufficient to demonstrate that Advantor took
"reasonable" efforts to maintain the secrecy (if any) of the Larson Information.
*See, e.g.*, *Premier Lab*, 10 So. 3d at 206 (holding that "the lack of a confidentiality
agreement does not necessarily defeat [an] argument that [information] is a trade
secret" because "[w]here an employee acquires, during the course of his
employment, a special technique or process developed by his employer," he is
under a duty to keep it confidential).

But we are unclear whether any information disclosed by Larson in these
emails—whether intended to be confidential or not—possessed the necessary
"independent economic value from not being generally known or readily

44

ascertainable" by parties that might benefit from its use.  Fla. Stat. § 688.002(4)(a).

Thus, we remand for the district court to make a determination whether, as a matter

of law, the information at issue constituted a trade secret under the applicable

standard.

### b.   *Misappropriation*

If the Larson Emails do contain trade secrets, then FUTSA's definition of

misappropriation contemplates several different scenarios of improper disclosure

and use of those trade secrets.  *See* Fla. Stat. § 688.002(2).  There is no evidence

that DRS disclosed the information contained in the Larson Emails to anyone

outside the company; the only question is whether DRS's use of the information

constituted misappropriation.  Thus, in relevant part, "misappropriation" means

"use of a trade secret of another without . . . consent by a person who . . . knew or

had reason to know that [his] knowledge of the trade secret was . . . [d]erived from

or through a person who owed a duty to the person seeking relief to maintain its

secrecy or limit its use."  Fla. Stat. § 688.002(2)(b).

There is no direct evidence showing how DRS put the information to use, if

at all—but it is undisputed that DRS managers saw value in it and sought to

disseminate it internally.  In reply to Larson's "Advantor Concepts" email,

Larson's manager stated:

45

> I did like the FYI on the Advantor equipment.  It is good information to
> share with our Advantor sites.  Go ahead and share the info directly with
> Benny Deleon, Lewis Campbell, Dave Arsenault, Axel Alvarez, and John
> Ellfeldt.  They each support an Advantor site.

The undisputed evidence shows that Larson sent the Advantor Concepts email to at

least one of these individuals, David Arsenault, the next day.  Construing these

facts in Advantor's favor, we infer that DRS did "use" at least some of the

information in a manner that may have violated Advantor's proprietary interest in

it.

The record further shows that DRS "knew or had reason to know" that

Larson, as a recent employee of Advantor, owed a duty to Advantor not to disclose

proprietary information.  Indeed, Larson was terminated when DRS found out he

had been disseminating what DRS believed could be confidential information.

Thus, there is no doubt that it was on notice of the existence of the confidentiality

provision and possibility of liability thereunder.

### c.    *Injury and Causation*

On the remaining question—whether Advantor was harmed by any

misappropriation of the Larson Emails—we again echo our analysis of injury

causation in the context of Advantor's tortious interference claim:  The record

contains sufficient evidence to enable a factfinder to conclude that, but for DRS's

efforts to "self-perform" under the SPAWAR consolidated contract, Advantor

would have been hired in a subcontract capacity to serve the Air Force bases running Advantor systems.

Because Advantor has created a jury question on two of the elements of a FUTSA claim, and because the district court did not reach a definitive conclusion on the third element—whether the Emails contained trade secrets—we REVERSE the district court's grant of summary judgment against Advantor as to the Larson Emails and remand for the district court to resolve this matter.

## II.   Denial of Motion to Compel Financial Discovery

Advantor further appeals the district court's order precluding discovery of DRS's financial information, which Advantor sought to support its prayers for lost-profit, disgorgement, and punitive damages (the "Financials Order").  The court found that the financial information Advantor had repeatedly requested—including audited financial statements for DRS for the two years at issue in this dispute—were "not relevant to the claims asserted by [Advantor] or any lawful damages flowing therefrom."  The court also stated that the magistrate judge "did not abuse his discretion in concluding that [Advantor] has not made a showing of punitive damages entitlement sufficient to warrant discovery of [DRS's] financial

condition."[11]  The court's holding seems to have been prompted by its view that

Advantor had not alleged a viable theory of injury.  Because we disagree with that

view, we VACATE the Financials Order and remand for the district court to

reconsider the question whether DRS has shown, as a matter of law, that its

conduct did not meet the standard for punitive damages,[12] in addition to any other

considerations relevant to a determination whether this discovery should proceed.

## III.   Exclusion of Expert Testimony

Advantor further appeals the district court's order excluding the report and

testimony of Advantor's economic expert (the "Expert Order").  If the Expert

Order were to stand, Advantor would be precluded from presenting expert

evidence calculating lost profits or disgorgement damages with respect to both its

---

[11]  In fact, the magistrate judge ordered that "DRS is not obligated to produce the requested [financial] discovery until such time as the Court rules that punitive damages are appropriately part of this case and that the requested information is pertinent evidence with respect to that claim."

[12]  Advantor sought punitive damages on both its tortious interference and FUTSA claims.  In both contexts, Advantor faces a heightened evidentiary standard.  To win punitive damages on a tortious interference claim under Florida law, a plaintiff must show evidence of "outrageous" conduct or "fraud, malice, wontonnesss or oppression."  *Imperial Majesty Cruise Line, LLC v. Weitnauer Duty Free, Inc.*, 987 So. 2d 706, 708 (Fla. 4th DCA 2008) (finding that defendant cruise company's efforts to stifle a competing retailer by physically blocking passengers' access to the store were calculated and predatory but not "sufficiently egregious" to warrant punitive damages).  Similarly, under FUTSA, punitive damages are permissible only where "willful and malicious misappropriation exists."  Fla. Stat. § 688.004(2).  The parties have not briefed the question of punitive damages.

tortious interference and FUTSA claims.  In denying this testimony, the district court stated that "lost profits is not the proper measure of damages" because "[n]one of the wrongs allegedly committed by DRS rendered Advantor ineligible to bid on the SPAWAR contract, and nothing DRS did caused Advantor to lose its contracts with the Air Force."  The court excluded Advantor's expert testimony because it found that the testimony would "not help the jury to determine a fact in issue; i.e. damages."

As discussed in our analysis of the tortious interference and FUTSA claims above, we do not agree with the district court's assessment of Advantor's theories of injury and causation.  Because the district court's ruling on the expert-testimony issue was premised on a ground that we have rejected, we VACATE for the district court to revisit whether the expert testimony should be excluded on other grounds.[13]

---

[13]  The Expert Order also excluded expert testimony quantifying the expenses Advantor incurred in suing the Advantor Employees for breach of their employment agreements.  This testimony was designed to support Advantor's prayer for compensation of litigation expenses incurred in its separate actions against the Advantor Employees.

The district court held in the Expert Opinion that the testimony "would not be helpful to a jury" because it merely performed "simple arithmetic of the numbers provided by Advantor regarding the state court lawsuits," which was "within the understanding" of a jury.  *See* Fed. R. Evid. 702 (establishing that expert testimony is appropriate based on "scientific, technical, or other specialized knowledge").  We agree and AFFIRM this portion of the Expert Order.

## IV.   Sanctions

Finally, we consider Advantor's challenge to a sanctions order issued by the district court following its grant of summary judgment.  Immediately after its summary judgment loss, Advantor filed an emergency motion to stay enforcement of the order.  In that motion, Advantor argued that a stay was necessary to protect its trade secrets in light of the district court's finding that Advantor failed to demonstrate that any of the information at issue constituted trade secrets.  This statement, Advantor argued, paved the way for DRS to further disseminate Advantor's proprietary information to its competitive advantage (and may have invited other competitors to do the same).

The court denied the motion in a one-page order, finding the motion "utterly baseless."  However, the Sanctions Order was founded on the court's belief that Advantor's theory of injury was illogical, making its claims plainly frivolous.  As discussed in our analysis of Advantor's summary-judgment claims, we disagree with the district court on this crucial point.  As such, we REVERSE the Sanctions Order.

## CONCLUSION

In summary, we affirm in part and reverse in part the district court's grant of summary judgment to DRS.  We affirm the grant of summary judgment as to Advantor's first claim: that DRS breached the Non-Disclosure Agreement.

As to Advantor's second claim—that DRS tortiously interfered with the Employment Agreements—we reverse the district court's grant of summary judgment as to that part of the claim alleging DRS's interference with the non-compete clause, finding disputed issues of material fact.  As to that part of the tortious interference claim alleging the dissemination of confidential information by former Advantor's employees, the district court did not analyze the claim other than to conclude that because Advantor had failed to show injury and causation, the claim could not proceed.  Because we disagree with the district court's conclusion on the above point, we reverse its grant of summary judgment on this sub-claim and remand for the court to determine, consistent with the other rulings in this opinion, whether summary judgment on this sub-claim is warranted on any other ground.

As to Advantor's third claim—misappropriation of trade secrets under Florida's Uniform Trade Secrets Act ("FUTSA")—we affirm the district court's

grant of summary judgment on that part of the claim alleging a violation of the statute as a result of DRS's alleged breach of the Non-Disclosure Agreement.

We reverse the district court's grant of summary judgment as to that part of the claim alleging misappropriation of trade secrets, as represented (i) by technical manuals and drawings handed over by the Air Force to DRS and (ii) by emails sent by former Advantor employee Greg Larson to DRS.  The district court should revisit its ruling on this claim, consistent with the direction provided in the pertinent discussion.  On any renewed motion for summary judgment, the district court should address more thoroughly the question whether, as a matter of law, these communications revealed trade secrets.

As to the district court's rulings disallowing financial discovery for the purpose of proving punitive damages and excluding expert testimony, those rulings were likewise premised on the court's conclusion that Advantor had failed, as a matter of law, to show injury and causation.  Because we have rejected that conclusion, we likewise vacate the above rulings so that the district court may reconsider them independent of any conclusion that Advantor has failed to create a jury question regarding injury and causation.

Finally, the district court issued an order sanctioning Advantor based on the latter's filing of an emergency motion to stay enforcement of the court's order

granting summary judgment.  As we have vacated the relevant portions of that order, we likewise vacate the order sanctioning the filing of this motion.

**AFFIRMED in part; REVERSED in part; and REMANDED**.

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 31, 2017

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 15-14992-FF  ; 16-11273 -FF
Case Style: Advantor Systems Corporation v. DRS Technical Services, Inc.
District Court Docket No: 6:14-cv-00533-GAP-DAB

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Janet K. Mohler, FF at (404) 335-6178.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs